COLLINS et al. v. PENN–WYOMING COPPER CO. et al.

CONTINENTAL & COMMERCIAL TRUST & SAVINGS BANK v. SAME.

(District Court, D. Wyoming. December 30, 1912.)

No. 555, In Equity.

1. CORPORATIONS (§ 213*)—STOCKHOLDERS' SUIT—MEASURE OF RELIEF.

The measure of relief that can be granted in a stockholders' suit for the benefit of the corporation is such only as could be granted to the corporation if it was the complainant.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 213.*]

2. CORPORATIONS (§ 204*)—DIVIDENDS—WRONGFUL DECLARATION—MORTGAGE —VACATION—STOCKHOLDERS' ACTION.

Under Wyoming statutes providing that if the directors of a corporation declare and pay a dividend when the company is insolvent, or authorize the payment of a dividend when the payment would render it insolvent, the directors shall be jointly and severally liable for all debts of the company,· or debts that shall thereafter be contracted while the directors continue in office, and making the directors assenting thereto liable to creditors personally for the excess, if the indebtedness shall at any time exceed the capital stock, neither the corporation nor a stockholder for the corporation's benefit could maintain an action to set aside a mortgage on the corporation's property because the dividends had been declared and paid when no profits had been earned.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 783–790; Dec. Dig. § 204.*]

3. CORPORATIONS (§ 204*)—STOCKHOLDERS' ACTION—PARTIES.

Stockholders in a representative action could not maintain a suit to set aside a mortgage on the corporation's property, because of an alleged unconscionable contract between the corporation and a securities company, voidable because certain directors of the corporation were also directors of the securities company; the latter not being a party defendant to the suit.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 783–790; Dec. Dig. § 204.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**4.** CORPORATIONS (§ 204*)—INDEBTEDNESS—ASSUMPTION—PAYMENT—COLLATERAL.

Certain subsidiary corporations being indebted in the sum of $1,390,000, the creditors pledged notes evidencing such debt as collateral for their own note for $558,000, which note was thereafter assumed and paid by the consolidated company under an agreement that it should have the collateral when it paid the note. *Held,* that such transaction was not fraudulent, and did not amount to a settlement of the subsidiary indebtedness for the amount so paid.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 783–790; Dec. Dig. § 204.*]

**5.** CORPORATIONS (§ 204*)—INDEBTEDNESS—SALE OF ASSETS.

A corporation owing debts which it was unable to meet, with suits pending and threatening for the collection thereof, referred the question of a sale of its assets to a committee of stockholders, and a plan was decided on to sell to a new company, in such a way that every shareholder of the old company had the privilege of entering the new company on the same terms as every other shareholder of the new company. *Held* that, such proposed transfer having been ratified by 93 per cent. of the old company's stockholders, who exchanged their stock for stock in the new company, it was neither fraudulent nor unlawful.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 783–790; Dec. Dig. § 204.*]

**6.** CORPORATIONS (§ 209*)—MORTGAGES—VALIDITY—OBJECTIONS.

· Where a corporation was indebted in a large sum, and all the stockholders were promptly advised of the exact situation, and that bonds were being sold to raise money with which to pay the corporation's debts, but none of the stockholders took any steps to restrain the issuance of the bonds or the execution of the mortgage for almost 2½ years, they were barred by laches from thereafter attacking the transaction.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 806, 807; Dec. Dig. § 209.*]

**7.** CORPORATIONS (§ 205*)—SALE OF ASSETS—MORTGAGES—VACATION—STATUS QUO.

Stockholders of a corporation in a representative action were not entitled to set aside a mortgage securing bonds issued by the company to pay debts, without offering to return the money received from the bondholders, so as to place them in statu quo.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 205.*]

In Equity. Suit by Vivan E. Collins and others against the Penn-Wyoming Copper Company and others, in which the Continental & Commercial Trust & Savings Bank filed its cross-bill to foreclose a mortgage on the corporation's property. Complaint dismissed, and decree for foreclosure on the cross-bill.

Willard A. White and Seymour Stedman, both of Chicago, Ill., for complainants.

James Mann, of Norfolk, Va., and Charles Hall Davis, of Petersburg, Va., for interveners.

Charles L. Powell, of Chicago, Ill., for defendant Continental & Commercial Trust & Savings Bank.

Wesley W. Hyde, of Grand Rapids, Mich., and John W. & H. V. Lacy, of Cheyenne, Wyo., for defendants Pennock and another.

RINER, District Judge. This is a bill in equity, brought by Vivan E. Collins and others, stockholders, against the Penn-Wyoming Cop-

per Company and others, whereby it is sought to set aside the conveyance of certain mining and other property conveyed by the Penn-Wyoming Copper Company to the United Smelters, Railway & Copper Company. The bill prays for the appointment of a receiver; that the United Smelters, Railway & Copper Company and its officers be enjoined from voting the stock of the Penn-Wyoming Copper Company; that the court cancel all bonds, scrip, or other evidence of indebtedness of the Penn-Wyoming Copper Company, or its subsidiary companies, which the court shall find to have been fraudulently or wrongfully issued; that the present receiver, Isaac N. Pennock, be directed to turn over to a receiver to be appointed by the court all of the assets and property of the Penn-Wyoming Copper Company found in his hands; that discovery may be had from Eugene N. Cobb, and that he be required to answer to whom he transferred 6,000,000 shares of the stock of the Penn-Wyoming Copper Company; that the defendant Edmund F. Richardson be required to show what bonds, in number and value, he holds, either in person or as a member of the stockholders' committee; that the Penn-Wyoming Copper Company be required to make full and complete discovery to the court, by its officers, showing in detail each and every person to whom the company transferred title to any of the bonds of an issue of $2,500,000; that all books, papers, and other property of the Penn-Wyoming Copper Company now in the possession of Isaac N. Pennock, receiver, be brought into the jurisdiction of the court, and be turned over to a receiver to be appointed by the court; that a decree be entered determining the ownership of the various bonds of the $2,500,000 issue to the Penn-Wyoming Copper Company, and that in case any of them shall be declared invalid that the defendant the Penn-Wyoming Copper Company be required to surrender them for cancellation; that the defendant the Continental & Commercial Trust & Savings Bank be enjoined from foreclosing the trust deed executed by the Penn-Wyoming Copper Company to the American Trust & Savings Bank, and that the bank be enjoined from selling or otherwise disposing of the bonds of the subsidiary companies; that the title of the complainants' stockholders in the Penn-Wyoming Copper Company to the stock and properties of that company and its subsidiary companies be quieted against all holders of mortgages, trust deeds, and bonds alleged to be illegally issued; that Isaac N. Pennock, as receiver, and also as president of the Saratoga & Encampment Railway Company, and also all its officers, be restrained and enjoined from selling, leasing, mortgaging, or in any manner incumbering or transferring any of the property of that company, except under orders and directions of the court. The bill also prays for leave to all other stockholders similarly situated to become parties.

The bill was filed September 8, 1910. December 21, 1910, the defendant the Continental & Commercial Trust & Savings Bank, trustee, filed its cross-bill to foreclose the trust deed made, executed, and delivered to American Trust & Savings Bank by the Penn-Wyoming Copper Company January 1, 1909. January 3, 1911, complainants filed a supplemental bill, to which answers were filed. March 15, 1911, the

complainants filed their answers to the cross-bill, and, replies having been filed thereto, the case was, on the 12th day of May, 1911, referred to the master. Answers to the original and supplemental bills of complaint were filed by all the defendants served with process; but in the view the court takes of this case, after a very careful and painstaking examination, it becomes unnecessary to refer to all of these pleadings.

The objections to the applications for leave to file the "joinder of Charles Hall Davis in the bill of complaint," and of Joseph W. Seward and others and of E. W. Albee and others to intervene, will have to be sustained, for the reason that all of these applications, in the opinion of the court, come too late. The views just expressed render it unnecessary to file the answers to the proposed joinder of Davis and the intervening petitions of Seward and others and Albee and others; also the replications to these answers, as well as the answers to the resistances.

[1] Coming, then, to a consideration of the rights of the parties under the pleadings and evidence, it may be well to notice at the outset in just what capacity the complainants bring this bill. It is averred in the bill that they are stockholders of the Penn-Wyoming Copper Company, and the wrongs which they seek to redress are wrongs against that company, and their rights are the rights of the Penn-Wyoming Company, if that company had brought the suit. Sufficient is averred in the bill to authorize the complainants to sue in the right of the company, but the measure of their relief is the measure of relief that could be granted to the company—no more, no less. The wrongs complained of against the company, and which the complainants, suing in its right, can redress, if the company itself would be entitled to relief, are: First, that dividends were declared by the Penn-Wyoming Copper Company when no profits had been earned; second, that the contract with the Equitable Securities Company was void; and, third, that it was a fraud not to credit the subsidiary corporations with the difference between the amount paid by the Penn-Wyoming Copper Company on its own debt and the amount of the notes of the subsidiary corporations which the Penn-Wyoming Copper Company had used as collateral to its debts. These propositions will be noticed in their order.

[2] The statutes of this state make no provision for a suit by a company to recover the amount of the debts owed by the company; and in this respect the statute differs from the statutes in some other states. Our statute provides that if the directors of a company declare and pay a dividend when the company is insolvent, or authorize the payment of a dividend when the payment would render it insolvent or would diminish the amount of its capital stock, they, the directors, shall be jointly and severally liable for all debts of the company then existing and for all debts that shall thereafter be contracted while the directors continue in office, relieving from liability any director or directors who object to declaring the dividend. Another section of the statute makes the directors assenting thereto liable to the creditors of the company, personally, for the excess if the indebt-

edness of the company shall at any time exceed the amount of its capital stock. These statutes must, I think, by the decided weight of authority, be strictly construed; and unless the statute provides that the directors shall be liable to the corporation it could not maintain the suit. In some states the statute provides that the directors shall be liable to the corporation and to its creditors, but our statute does not contain such provision. In 2 Cook on Corporations, § 546, the author says: "A statutory liability for dividends paid out of the capital stock abrogates all common-law liability, and if such statute does not prohibit such dividends they may be declared and paid subject to such liability." Whether or not any relief could be had in this suit against the directors, if they were before the court, it is unnecessary to discuss, for the reason that they are not made parties. In any event, I do not see how the fact, if it be a fact, that unlawful dividends had been declared, or the fact that the subsidiary companies had created excessive debts, would affect the rights of the Continental & Commercial Trust & Savings Bank as trustee, for the parties represented by it stand in the position of secured creditors. I think it is perfectly clear that the Penn-Wyoming Copper Company could not, and therefore the shareholders in a suit in its right could not, avoid the mortgage, or trust deed, because at some time in the past the Penn-Wyoming Copper Company had unlawfully declared dividends upon its stock. And the same would be true if at some time the subsidiary companies had created debts in excess of their capital stock. As to the last suggestion, however, I think the evidence shows that the capital stock of each subsidiary company was in excess of its debts.

[3] It was urged at the argument that the Equitable Securities Company had obtained an unconscionable contract from the Penn-Wyoming Copper Company, and that the directors of the Penn-Wyoming Copper Company, or some of them, at least, were likewise directors of the Equitable Securities Company, and thus made a contract with themselves, and thereby committed a fraud upon the Penn-Wyoming Copper Company. Conceding that this is all true, and that the contract in a proper suit could be set aside for that reason, either by the Penn-Wyoming Copper Company or the plaintiffs suing in its right, yet I think it is quite uniformly held that such a contract is not void, but voidable. The Equitable Securities Company is not made a party defendant, and I think it entirely clear that, until that contract is avoided, no right accrues against the defendant in this suit.

[4] It was also said at the argument that the debt of $1,390,000 was settled for $558,000, and that the continuance against the subsidiary companies for the full amount of the claim constituted a fraud. As I understand the record, the subsidiary companies owed $1,390,000, and that the creditors of these companies pledged notes evidencing this debt, and with those notes as collateral gave their own note for $558,000, and thereafter this $558,000 note was assumed and paid by the Penn-Wyoming Copper Company, with the agreement that it should have the collateral when it paid the note. This it did, and the collateral was turned over to it. I am wholly unable to see where there was any fraud in this transaction.

It appears in the record that $690,000 in bonds were issued by the subsidiary corporations prior to the organization of the North American Copper Company, or the Penn-Wyoming Copper Company, its successor; and it was suggested at the argument that these bonds were obtained without consideration and passed on down to the new corporation. The evidence offered in support of this contention is most unsatisfactory. In the first place, it came in as rebuttal, and is subject to technical objection for that reason. But, passing that, the testimony of Mr. West and Mr. Best was, when testifying in chief, that bonds were sold and moneys received prior to 1902. The testimony of Mr. Knapp shows that he was the local accountant at Encampment, and was not familiar with the business of the general offices of the North American Copper Company, which at that time were located at Denver. He also testified that moneys were received and placed by the North American Copper Company to the credit of these subsidiary companies, and that the source from which the moneys came was unknown to him. The little black book which was offered in evidence, while it shows that certain stocks were issued as a bonus, does not show that the bonds were issued as a bonus, nor did it indicate that the bonds were delivered to any one without consideration. The books of the North American Copper Company showing the transaction are not in the record, nor a statement of their contents by any witness who examined them; and for the court to say that these bonds were delivered without consideration, when there is no testimony as to whether they were or were not, and especially in a suit where the question is not in issue and the American Copper Company is not a party, would be violative of every presumption which the law indulges in favor of the validity of business transactions, until the contrary is made to appear by sufficient proof. And, again, I am unable to see how that fact, if it be a fact, could possibly affect the issues now before the court, for the owners of these bonds are not parties to this suit; and how the court could render a decree declaring the bonds invalid in the absence of their owners is difficult to understand. The only way the question could possibly be reached in this litigation, if at all, would be on distribution of the proceeds of the sale of the property, and whether it can be so reached it is not now necessary to decide.

The same suggestion applies to the $500,000 issued, designated in the record as the "Ferris-Haggerty purchase bonds."

It was also urged at the argument that the $394,450 of bonds issued to the Ferris-Haggerty Company were of doubtful validity. This contention is, I think, without any merit whatever. The testimony of Mr. James A. Rendle, secretary of the Ferris-Haggerty Company, is perfectly clear as to this transaction and stands undisputed. The parties seem to have been dealing at arm's length in this transaction. The shareholders and directors of the Ferris-Haggerty Company were not shareholders or directors of the Penn-Wyoming Copper Company, and Mr. Rendle's testimony shows clearly that the $394,450 worth of bonds of the Penn-Wyoming Copper Company were accepted by the Ferris-Haggerty Company in payment and satisfaction of the pur-

chase-price mortgage which the Ferris-Haggerty Company had upon the mine.

[5] As to the sale of the property to the United Smelters, Railway & Copper Company, but little need be said. The Penn-Wyoming Copper Company owed debts in very large amounts, which it was then unable to meet. There were suits pending and threatened for the collection of these debts, and the situation of the company was such that it could not go on. The whole question was referred to a committee of stockholders, and a plan was decided upon to sell to a new company in such a way that every shareholder of the Penn-Wyoming Copper Company had the privilege of entering the new company on the same terms as every other shareholder in the new company. No one was preferred, and about four-fifths of the stock agreed to the proposition. This action was subsequently ratified by 93 per cent. of the shareholders of the Penn-Wyoming Copper Company, who exchanged their stock for stock in the new company. In the circumstances in which the company found itself, the court is of the opinion that a sale in this way was perfectly lawful. The company was no longer able to profitably continue in business. There seems to be no proof of unfairness, oppression, or fraud in relation to this sale, for every stockholder was notified, and, as suggested, 93 per cent. ratified and approved it, which alone would, perhaps, be sufficient.

[6] But there is another reason why the court ought not now to interfere. All of the stockholders, as we have seen, were advised promptly of the exact situation and that the bonds were being sold for the purpose of raising money to pay the debts of the company. Yet, notwithstanding this information, the mortgage was executed by the Penn-Wyoming Copper Company without objection, and the bonds secured thereby were in most part sold in the market almost 2½ years before this suit was brought, and all of them were sold before the suit was brought. The delay must, I think, be held to be fatal.

[7] One other matter may be briefly noticed. The rule is, I think, quite universal that to entitle the vendor to rescind a sale of goods, and recover them from the purchaser, he must first restore the party to the same condition and advantage, as far as reasonably can be done, as he occupied before the purchase. Applying the rule to this suit, if no sale had been made to the United Smelters, Railway & Copper Company, and if no bonds of the Penn-Wyoming Copper Company had been sold, the plaintiffs would have their shares of stock subject to the rights of creditors, and subject to the mortgage given· to the Ferris-Haggerty Company, which was taken up by the bonds of the Penn-Wyoming Copper Company. There is no offer in the bill to restore the Ferris-Haggerty mortgage, or to pay the debts which have been paid by the proceeds received from the sale of the bonds. This, I think, is necessary. To hold otherwise would be to return to the shareholders the property of the Penn-Wyoming Copper Company in better condition than it was before, and freed of all the liens which were ahead of any claims the stockholders might have.

As stated at the outset, I have given this case painstaking and very laborious examination, and while in this memorandum I have only

briefly noticed the principal questions involved, it is sufficient to advise counsel of the view the court has taken of this suit. A decree will be entered foreclosing the trust deed as prayed in the cross-bill, with this additional provision: If upon sale of the property it shall be bid in by the bondholders, they shall pay into the registry of the court an amount in cash sufficient to pay all costs due and to become due to the clerk of the court in this suit, and all costs, expenses, and allowances made to the master for services in conducting the sale.