(No. 13929.—Reversed and remanded.)

THE TRANSCONTINENTAL OIL COMPANY, Appellant, *vs.*
LOUIS L. EMMERSON, Secretary of State, Appellee.

*Opinion filed June 22, 1921.*

1. WORDS AND PHRASES—*meaning of the term "corporeal property."* The term "corporeal property" refers to property in corporeal things, and in law is regarded as the right to possess, use, occupy and enjoy corporeal things and take the profits thereof.

2. EASEMENTS—*definition of an easement.* An easement is the right which the owner of one parcel of land has, by reason of such ownership, to use the land of another for a special purpose not inconsistent with the general property in the owner, and is distinct from the occupation and enjoyment of the land itself and gives no right to participate in the profits of the soil charged with the easement.

3. LEASES—*ordinary form of oil and gas lease conveys an interest in the land itself.* Oil and gas in the earth cannot be the subject of ownership distinct from the soil, and hence a conveyance of the right to enter upon land for the purpose of mining and operating for oil and gas, laying pipe lines and building structures to produce and care for the products is a conveyance of an interest in the land itself, which, if of indefinite duration, is a freehold estate in the land.

4. CORPORATIONS—*foreign oil corporation should be allowed to include leaseholds in estimating proportion of capital stock in Illinois.* In estimating the proportion of capital stock represented by business transacted and property located in Illinois for assessment of the franchise tax for doing business in Illinois, a foreign oil corporation should be allowed to include in the total amount of its tangible property all the property held by it by the ordinary form of an oil and gas lease, as such an instrument conveys to the company an estate in the land, which is corporeal property.

APPEAL from the Circuit Court of Sangamon county; the Hon. E. S. SMITH, Judge, presiding.

SCOTT, BANCROFT, MARTIN & STEPHENS, and BROWN, HAY & CREIGHTON, (JOHN E. MacLEISH, GEORGE W. SWAIN, and LOGAN HAY, of counsel,) for appellant.

EDWARD J. BRUNDAGE, Attorney General, (CLARENCE·
N. BOORD, and JAMES W. GULLETT, of counsel,) for ap-
pellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

The Transcontinental Oil Company, a Delaware corpo-
ration authorized to do business in the State of Illinois,
filed its report for the year 1919 as required by the general
Corporation act, (Laws of 1919, p. 316,) and the Secre-
tary of State assessed a franchise tax of five cents on each
$100 of the proportion of its authorized capital stock rep-
resented by business transacted and property located in this
State upon the basis of his finding that .01241 of complain-
ant's authorized capital of $200,000,000, being $2,482,000,
was employed in its business within this State. The Sec-
retary of State also notified the corporation that inasmuch
as in filing its application to be admitted to do business
within the State of Illinois in the year 1919, in accordance
with paragraph (*e*) of section 81 of the general Corpora-
tion act, it had estimated the total amount of its authorized
capital to be employed by it in business within the State
of Illinois at $183,000 and had paid its initial franchise
fee on that basis, there was due to the State an additional
fee for the preceding year of $1149.50, based upon the
difference between the estimated sum of $183,000 and
$2,482,000, the amount of authorized capital found by the
Secretary of State to be employed by the appellant within
the State. The Secretary of State further notified the
company that unless both amounts were paid on or before
July 31, 1920, there would be assessed a penalty of five
per cent for each month until they should be paid. The
corporation insisted that the franchise tax should be only
$117.10, based upon its claim that the proportion of its
authorized capital employed in its business within the State
of Illinois was only .001171, or $234,200, and that the

deficit in the amount of its initial franchise fee paid in 1919 was only $25.60, being .001171 of the difference between $183,000 and $234,200. ˉ The company being unable to induce the Secretary of State to accept the smaller amounts which it insisted were all that it owed, in order to avoid the penalties imposed by the act if the tax assessed should not be paid by July 31, 1920, it deposited with the Secretary of State the sum of $2390.50, being the total tax assessed, accompanying the deposit with a written protest specifying the grounds for its objection to the tax. Afterward, on September 27, 1920, the company filed a bill in the circuit court of Sangamon county against the Secretary of State praying for an injunction against his turning over to the treasurer or otherwise disposing of the funds deposited by the company without first deducting therefrom $2247.80, and from forfeiting, annulling, canceling, declaring void or otherwise interfering with the authority and license of the appellant to do business in the State of Illinois, or declaring it without authority to do business in Illinois, or from imposing any penalty provided in the general Corporation act for failure promptly to pay its franchise tax. A temporary injunction was issued. The bill was afterward amended and the demurrer to it was sustained. The complainant electing to stand by its bill, the court dismissed the bill for want of equity, the injunction was dissolved and the complainant appealed.

The wide divergence in these estimates of the proportion of the company's capital employed in its business in the State of Illinois arose out of a difference of opinion as to what constitutes the tangible property of the corporation. Section 106 of the general Corporation act provides that "in ascertaining the amount of the authorized capital stock represented by business transacted and property located in this State, the sum of the business of any foreign or domestic corporation transacted in this State and the total tangible property of such corporation located within this State shall

be divided by the sum of the total business of the corporation, and the total tangible property of the corporation wherever situated." Section 137 provides that "the term 'tangible property' as used in this act, shall mean corporeal property, such as real estate, machinery, tools, implements, goods, wares and merchandise, and shall not be taken to mean money, deposits in bank, shares of stock, bonds, notes, credits or evidence of an interest in property or evidences of debt."

It appears from the report filed by the appellant with the Secretary of State that the total value of all the property of the appellant, wherever located, amounted to $196,706,277.38; that of this amount $175,649,289.81 represented the value of oil leaseholds and oil properties owned by the appellant and located outside the State of Illinois; that appellant's total business transacted at or from places in Illinois during the year 1919 was $228,690.01 and its total business everywhere transacted was $3,107,107.63; that the total property of the appellant within the State of Illinois has a value of $5500, and that the authorized capital stock of the appellant consisted of 2,000,000 shares without nominal or par value.

The only question upon which the parties disagreed, as stated by the appellant and accepted by the appellee, is whether or not the value of the oil leaseholds of the appellant should have been included in determining the total tangible property of the corporation wherever situated. The Secretary of State excluded such oil leaseholds, and the appellant insists that they should have been included as a part of its tangible property.

The appellant's oil and gas leaseholds covered properties owned and operated by it in many different States and in foreign countries, and were held under instruments the form of which is attached to the bill as "Exhibit D." They provided that "the lessor, for and in consideration of ........ dollars, cash in hand paid, receipt of which is hereby ac-

knowledged, and of the covenants and agreements hereinafter contained on the part of the lessee to be paid and kept and performed, ha.. granted, demised, leased and let, and by these presents do.. grant, demise, lease and let unto the said lessee, for the sole and only purpose of mining and operating for oil and gas, and of laying of pipe lines, and of building tanks, powers, stations and structures thereon to produce, save and take care of said products, all a certain tract of land situate in the county of ........., State of ........., described as follows, to-wit, * * * and containing ...... acres, more or less." It is agreed that "this lease shall remain in force for a term of ...... years from this date, and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee." The lessee covenants and agrees:

"1st. To deliver to the credit of the lessor, free of cost, in the pipe line, to which .... may connect .... wells, the equal one-eighth part of all oil produced and saved from the leased premises.

"2d. To pay the lessor ........ dollars each year, in advance, for the gas from each well where gas, only, is found, while the same is being used off the premises, and lessor to have gas free of cost from any such well for .... stoves and .... inside lights in the principal dwelling house on said land during the same time by making .... own connections with the well at ..... own risk and expense.

"3d. To pay lessor for gas produced from any oil well and used off the premises at the rate of ........ dollars per year for the time during which such gas shall be used, said payments to be made each three months in advance.

"If no well be commenced on said land before the .... day of ........, 191.., this lease shall terminate as to both parties, unless the lessee, on or before that date, shall pay or tender to the lessor or to the lessor's credit, in the ........ bank at ........, or its successors, which shall continue as the depository regardless of changes in the ownership of

said land, the sum of ...... dollars, which shall operate
as a rental and cover the privilege of deferring the com-
mencement of a well for ...... months from said date.
In like manner, and upon like payments or tenders, the
commencement of a well may be further deferred for like
period of the same number of months successively. And
it is understood and agreed that the consideration first re-
cited herein, the down-payment, covers not only the privi-
lege granted to the date when the first rental is payable as
aforesaid, but also lessee's option of extending that period
as aforesaid, and any and all other rights conferred. Should
the first well drilled on the above described land be a dry
hole, then and in that event if a second well is not com-
menced on said land within twelve months thereafter this
lease shall terminate as to both parties, unless the lessee, on
or before the expiration of said twelve months, shall re-
sume the payment of rentals in the same manner as here-
inabove provided." * * *

The appellee contends that an instrument of this charac-
ter does not convey tangible or corporeal property but cre-
ates only an incorporeal right. Definitions are cited from
dictionaries from which it appears that "tangible" means
capable of being touched, and "corporeal," of a material
or physical nature, and these definitions are of no particu-
lar assistance in arriving at the conclusion of the matter.
"Property, in its broader sense, is not the physical thing
which may be the subject of ownership, but is the right of
dominion, possession and power of disposition which may
be acquired over it." (*Braceville Coal Co.* v. *People*, 147
Ill. 66.) "Property, in its appropriate sense, means that
dominion or indefinite right of user and disposition which
one may lawfully exercise over particular things or sub-
jects, and generally to the exclusion of all others, and doubt-
less this is substantially the sense in which it is used in
the constitution, yet the term is often used to indicate the
*res* or subject of the property rather than the property it-

self." (*Rigney* v. *City of Chicago,* 102 Ill. 64.) That
case made clear the distinction between an injury to the sub-
ject of property, the thing in which property exists, and a
direct physical obstruction or injury to the right of user
and enjoyment of the thing which is the actual property.
"Property itself, in a legal sense, is nothing more than the
exclusive right 'of possessing, enjoying and disposing of a
thing,' which, of course, includes the use of a thing." (*Chi-
cago and Western Indiana Railroad Co.* v. *Englewood Con-
necting Railway Co.* 115 Ill. 375.) "Sometimes the term
is applied to the thing itself, as, to a horse or a tract of
land. These things, however, though the subjects of prop-
erty, are, when coupled with the possession, but the indi-
cia,—the visible manifestations of invisible rights; 'the
evidence of things not seen.' Property, then, in a deter-
minate object is composed of certain constituent elements,
to-wit, the unrestricted right of use, enjoyment and disposal
of that object." *City of St. Louis* v. *Hill,* 116 Mo. 527.

According to these definitions of property there is no
such thing as tangible property or corporeal property. The
right to use, enjoy, control and dispose of anything is not
capable of being touched and is not of a material or physi-
cal nature. It is a mere idea; a mental conception; a legal
consequence of certain circumstances. Bouvier's Law Dic-
tionary defines corporeal property as "that which consists
of such subjects as are palpable. In common law the term
to distinguish the same thing is property in possession. It
differs from incorporeal property, which consists of choses
in action and easements, as, a right of way and the like."
"The objects of dominion or property," says Blackstone,
"are things as contradistinguished from persons, and things
are by the law of England distributed into two kinds:
things real and things personal. Things real are such as
are permanent, fixed and immovable, which cannot be car-
ried out of their place, as lands and tenements; things per-
sonal are goods, money and all other movables, which may

attend the owner's person wherever he thinks proper to go."
(2 Blackstone's Com. 16.)   The objects of property men-
tioned are all corporeal, and corporeal property refers to
and is property in corporeal things.   The right to possess,
use, occupy and enjoy corporeal things and take the profits
thereof is what the law regards as corporeal property.

There is also property which is not corporeal and does
not directly concern corporeal things.   Such are a patent
right,—the exclusive right to make, use and vend an article
which is the result of a new and useful invention; a copy-
right,—the exclusive right to multiply copies of an author's
publication; a trade-mark or trade-name; a franchise to be
a corporation.   None of these rights have any direct con-
nection with corporeal things.   The sole value of the first
three is to prevent others than the proprietor from taking
the benefit of his skill and work without his consent, and
of the last to enable him to secure the advantage of corpo-
ration management in the conduct of his business.

There are also rights to be exercised in connection with
corporeal things but without any ownership, possession, con-
trol or power of disposition of the thing in connection with
which the power may be exercised and without any profit
therein, such as a right to pass over another's land; to have
an unobstructed passage of light and air over another's land;
to have the soil in its natural state supported by another's
land; to have a building restriction on another's land ob-
served.   These are easements which consist in the right of
the owner of one parcel of land, by reason of such owner-
ship, to use the land of another for a special purpose not
inconsistent with the general property in the owner, and are
always distinct from the occupation and enjoyment of the
land itself.   (*Wessels* v. *Colebank,* 174 Ill. 618.)   A dis-
tinguishing feature of an easement is the absence of all
right to participate in the profits of the soil charged with
it.   *Stackpole* v. *Healy,* 16 Mass. 33; *Cobb* v. *Davenport,*
33 N. J. L. 223.

The appellee has cited a number of Federal decisions holding that a lease to mine for oil and gas is a mere incorporeal right to be exercised in the land of another, and that an instrument substantially in the form of the appellant's leases grants only an option to explore for oil and gas, not amounting to an estate in the land. These cases are: *Federal Oil Co.* v. *Western Oil Co.* 112 Fed. 373; *Priddy* v. *Thompson,* 204 id. 955; *Kemerrer* v. *Midland Oil and Gas Co.* 229 id. 272; *Shaffer* v. *Marks,* 241 id. 139; *Brunson* v. *Carter Oil Co.* 259 id. 656. They are based upon the fugacious nature of oil and gas, which renders them not susceptible of ownership distinct from the soil, and therefore incapable of conveyance by a deed of the oil and gas underlying a specified tract, together with the use of so much of the surface as may be necessary to recover the oil and gas. So it is held by the Supreme Court of Oklahoma that such a lease conveys to the grantee no estate in the land or title to the oil and gas but only a right to prospect, which is held to be an incorporeal hereditament. (*Kolachny* v. *Galbreath,* 26 Okla. 772; *Rich* v. *Doneghey,* 177 Pac. (Okla.) 86; *State* v. *Welch,* 184 Pac. (Okla.) 787.) *Heller* v. *Dailey,* 28 Ind. App. 555, is to the same effect. On the other hand, in *Barnsdall* v. *Bradford Gas Co.* 225 Pa. 338, the Supreme Court of Pennsylvania held, following numerous previous decisions of that court, that language substantially the same as that of the exhibit attached to the appellant's bill shows the instrument to be a lease conveying an interest in land,—a corporeal and not an incorporeal hereditament. The same view has been taken by the Supreme Courts of other jurisdictions. *Wilson* v. *Hughes,* 43 W. Va. 826; *Woodland Oil Co.* v. *Crawford,* 55 Ohio St. 161; *Brown* v. *Fowler,* 65 id. 507; *Southern Oil Co.* v. *Colquitt,* 28 Tex. Civ. App. 292; *Wolfe County* v. *Beckett,* 127 Ky. 252; *Murray* v. *Allard,* 100 Tenn. 100.

We have held, in accordance with the decisions in the cases last cited and in accordance with what we regard as

the better reason as well as the weight of authority, that an instrument of the character of that in question here, which is a form of oil and gas lease in common use in this State, conveys a freehold interest in the real estate to which it applies, and is, in effect, a sale of a part of the land. Oil and gas in the earth cannot be the subject of an ownership distinct from the soil. They belong to the owner of the land only so long as they remain under the land, and his grant of them to another is a grant only of such oil and gas as the grantee may find, and no title to it vests in the grantee until it is actually found. The conveyance, however, of the right to enter upon the land for the purpose of prospecting and operating for oil and gas, laying pipe lines and building powers, stations and structures to produce, save and care for the products is a conveyance of an interest in the land itself, which, if of indefinite duration, is a freehold estate in the land. *Bruner* v. *Hicks,* 230 Ill. 536; *Watford Oil and Gas Co.* v. *Shipman,* 233 id. 9; *Poe* v. *Ulrey,* id. 56; *People* v. *Bell,* 237 id. 332; *Ohio Oil Co.* v. *Daughetee,* 240 id. 361; *Daughetee* v. *Ohio Oil Co.* 263 id. 518.

The instruments in question conveyed to the appellant an estate in the land mentioned in them which is corporeal property, and the statute requires the value of such property to be included in the total amount of the tangible property of the corporation. Since it appeared that this requirement was not observed the demurrer to the bill should have been overruled.

The decree will be reversed and the cause will be remanded, with directions to overrule the demurrer.

*Reversed and remanded, with directions.*