## NELSON DEVELOPMENT CO. v. OHIO OIL CO.

### No. 227–D.

District Court, E. D. Illinois.

July 28, 1942.

934

Kirk, Lee & Fleetwood, of Tulsa, Okl., Ortmeyer, Bamberger and Ortmeyer, of Evansville, Ind., and Allen, Dalbey & Foreman, of Danville, Ill., for plaintiff.

Fred W. Gee, of Lawrenceville, Ill., and Fred H. Pannill, of Marshall, Ill., for defendant.

LINDLEY, District Judge.

Plaintiff seeks judgment of this court that defendant holds as constructive trustee, an oil and gas lease on 90 acres of land of one Stevens in Richland County, Illinois, and as such account to plaintiff for profits realized by defendant from producing wells upon said premises. Defendant denies that the facts and circumstances justify a conclusion that a constructive trust exists and that plaintiff is entitled to any relief.

Plaintiff and defendant are engaged, amongst other activities, in exploration for and production of oil and gas in the Illinois field and elsewhere. On May 23, 1941 both were owners of leases in the then undeveloped speculative territory in which the Stevens land is located. No wells had been drilled and both were anxious to know whether oil existed in commercially profitable quantities. Defendant proposed to plaintiff that it would drill a well upon premises just east of the Stevens tract. Plaintiff's leases lay to the east, north and southeast of the proposed site and it had no acreage lying southwest or west thereof. Giffel, "land agent" of defendant, and Smith, his assistant, on May 23, 1941, conferred with Ross, "land man" of plaintiff. After stating that defendant proposed to drill a well, Giffel inquired of Ross whether

plaintiff, being interested in ascertainment of whether the territory was commercially productive, would agree to contribute $2,-500 toward the cost of drilling the well, if oil should not be found in paying quantities. Ross replied that plaintiff was willing to contribute $2,000 to such fund, provided defendant would procure for plaintiff a lease on the Stevens tract or on one equally well located. Inasmuch as plaintiff held no leases in that direction from the proposed drilling site and it was uncertain, if oil should be found, whether commercial production would run to the east or to the west, Ross said that if such a lease could be procured, he would make the contribution and would pay $500 for the lease. Giffel replied that he had no authority to make any such agreement but that he would confer with his superior officers to determine whether his company would consider getting additional acreage for plaintiff. Ross said that he would send no brokers into the territory in an attempt to procure the lease and to this Smith made no reply except to say, "that would be very nice."

Accordingly, plaintiff, at its home office in Tulsa, prepared a written contract, fixing the terms upon which it would contribute $2,000 but mentioning nothing concerning procuring additional acreage for plaintiff by defendant. This contract was then executed by defendant. Ross in a letter reporting the facts to plaintiff's officers, preliminary to the drafting of the contract, made no mention of the alleged contract of defendant to procure the Stevens lease for plaintiff.

On May 28 defendant wrote Ross saying that it was under no obligation to procure such acreage. Ross early in June told Giffel that he was surprised at the letter; that he felt that he had a contract for the Stevens lease. Giffel then wrote him further that defendant still denied any obligation to procure a lease. Some weeks later Ross talked to Smith in West Salem and testified that Smith told him then that there was a contract by defendant to procure the Stevens lease and assign it to Nelson. This Smith denied. Later Ross talked to Carroll, an executive officer of defendant, who denied any obligation upon defendant's part to procure the lease for plaintiff and on August 8, told Ross that the matter would not be discussed or considered further. Nothing further occurred between the parties until after defendant had drilled on the proposed site and discovered oil in paying quantities.

This event terminated any liability of plaintiff to contribute anything whatever to the cost of the well. After the discovery of oil, in November, defendant filed this suit.

■ The evidence was controverted but I find that the facts are as hereinbefore stated and that there was no meeting of the minds of the parties upon an express contract to the effect that defendant would attempt to procure and if it succeeded would assign a lease from Stevens to plaintiff. I do not impute to Ross any desire to misrepresent what occurred between him and Giffel and Smith on May 23. I feel rather that this is another demonstration of the frailty of human recollection often apparent in litigation where parol negotiations have occurred. No doubt Ross felt that plaintiff should have additional acreage; no doubt he was anxious to procure it. But I do not believe that the parties' minds met on any final agreement in that respect. The fact that the litigation was not begun until after commercially profitable oil had been discovered, that in reporting his negotiations to his superior officers, Ross made no mention of the alleged promise to procure additional acreage and that the written agreement between the parties made no mention of such agreement but constituted merely a contract as to the contribution for drilling a dry hole, all tend to corroborate the evidence of defendant that the negotiations regarding additional acreage were wholly executory and provisional and fell far short of a binding contract. It follows that plaintiff is entitled to no relief.

If I have erred in my finding that no contract came into existence and that Giffel and Smith did not in fact make a binding agreement with Ross to have defendant procure and assign to plaintiff the Stevens lease, we are met with certain legal questions as to the enforcibility of this contract and the granting of relief to plaintiff because of what occurred. Amongst these are these questions: Did Giffel and Smith have authority to bind Ohio? Was the contract within the statute of frauds of the State of Illinois? Was there, even if there were no contract, such a relationship between the parties as would create a fiduciary relationship upon the part of defendant toward plaintiff? Were the circumstances such that it can be said that defendant committed fraud or other inequitable conduct as a result whereof the Stevens lease should be held by defendant as a constructive trustee for the benefit of plaintiff? Delfosse v.

Delfosse, 287 Ill. 251, 122 N.E. 484; Lantry v. Lantry, 51 Ill. 458, 2 Am.Rep. 310; Lowenberg v. Booth, 330 Ill. 548, 162 N.E. 191.

■ If there had been a clear and unambiguous contract, inasmuch as it provided for conveyance of a freehold interest in land, Ohio Oil Co. v. Daughetee, 240 Ill. 361, 88 N.E. 818, 36 L.R.A.,N.S., 1108; Daughetee v. Ohio Oil Co., 263 Ill. 518, 105 N.E. 308; Transcontinental Oil Co. v. Emmerson, 298 Ill. 394, 131 N.E. 645, 16 A.L. R. 507, it would have been within the statutes of fraud of Illinois, as it involved the sale or transfer of interest in land within the meaning of the statutes. 3 Summers on Oil & Gas, Perm.Ed., § 612, p. 543; Smith-Hurd Stats.Ill. c. 59, § 2. Such a contract is not enforcible in a suit for specific performance. Can the desired result be reached in a suit to declare a constructive trust, beyond the bar of the statute of frauds?

■ A constructive trust is to be distinguished from a resulting trust, the essentials of which do not exist here, and from an express trust. It arises wholly by construction of law from circumstances negativing any intent upon the part of the contracting parties to create a trust, in those cases where there is no intent to create a trust, but where the acts of defendant constitute conduct which equity stamps as unfair, wrongful, unjustified and thereby, loosely speaking, as fraudulent. It is an involuntary trust, a fiction of equity, devised to the end that equitable remedies available against a conventional fiduciary may be available under the same name and processes because, through fraud or any other means, ex maleficio, defendant has procured a valuable advantage of another which in equity he ought not to retain. 3 Bogert, Trusts and Trustees, c. 24, § 471, pp. 1451, 1453, 1455. Ropacki v. Ropacki, 354 Ill. 502, 188 N.E. 400; Stubbings v. Stubbings, 248 Ill. 406, 94 N.E. 54; Delfosse v. Delfosse, 287 Ill. 251, 122 N.E. 484; Walsh v. Stock Yards Tr. & Sav. Bank, 345 Ill. 265, 178 N.E. 102. Bogert sets up the following example, 3 Bogert, Trusts and Trustees, § 479, p. 1494: "If A is the owner of Blackacre in fee, and orally contracts to sell it to B, but refuses to do so and pleads the statutes, B seeks to charge A as a constructive trustee of the land for him and demands a conveyance on the payment of the price. Or the same situation may arise where A does not then own Blackacre but contracts that he will buy it and

convey it to B and there is no written evidence of the contract. In each case, says Bogert, it is clear that equity can not decree a constructive trust without overriding the statute of frauds and that to enforce a constructive trust for the oral contract vendee is of the same effect as to decree specific performance. Equity is bound by the statute of frauds just as are courts of law." Accordingly it is well established that the mere fact that a contract vendor has refused to carry out an informal voidable contract to sell land is not adequate ground on which to declare a constructive trust in favor of the vendee. 3 Bogert, Trusts and Trustees, chap. 24, § 479; Delfosse v. Delfosse, 287 Ill. 251, 122 N.E. 484. Bogert concludes that though the contract vendee in this type of case may be disappointed, there is no unjust enrichment of the vendor at his expense; that, though he has lost a chance to make a profit by obtaining the land, the statute of frauds has provided that such a loss shall be the penalty for the informality of his contract.

The Supreme Court of Illinois has held that an executory contract for the sale of land orally made is within the provisions of the statutes and may be avoided by defendant when he relies upon the statute. Ropacki v. Ropacki, 354 Ill. 502, 188 N.E. 400; Koenig v. Dohm, 209 Ill. 468, 70 N.E. 1061; Stein v. McKinney, 313 Ill. 84, 144 N.E. 795; Kelly v. Fischer, 263 Ill. 184, 105 N. E. 21. In Delfosse v. Delfosse, 287 Ill. 251, 122 N.E. 484, 488, the court said that a constructive trust will arise only in case of some fraud or advantage taken in procurement of conveyance and that the mere breach of promise to convey is not sufficient. The court said: "The distinction is this: If A voluntarily conveys land to B, the latter having taken no measures to procure the conveyance, but accepting it and verbally promising to hold the property in trust for C, the case falls within the statute, and chancery will not enforce the parol promise. But if A was intending to convey the land directly to C, and B interposed and advised A not to convey directly to C, but to convey to him, promising, if A would do so, he (B) would hold the land in trust for C, chancery will lend its aid to enforce the trust, upon the ground that B obtained the title by fraud and imposition upon A. The distinction may seem nice, but it is well established. In the one case, B has had no agency in procuring the conveyance to himself; in the other, he has had an active and fraudulent agency. In the one case he has done nothing to prevent a conveyance to the intended beneficiary; in the other, he has, by false promises, diverted to himself a conveyance about to be made to another."

In Davis v. Stambaugh, 163 Ill. 557, 45 N. E. 170, it is said that the mere refusal of a trustee to execute an express direction or the denial of the existence of the trust by the trustee does not constitute such fraud as takes the case out of the statute. There must be an element of fraud accompanying the promise by means of which the acquisition of the legal title is wrongfully consummated. This doctrine is approved in Ryder v. Ryder, 244 Ill. 297, 91 N.E. 451, and McHenry v. McHenry, 248 Ill. 506, 94 N.E. 84. There the court said [287 Ill. 251, 122 N.E. 489]: "There is no evidence that Mrs. Delfosse made any promise to procure her husband to have the deeds made to her. She merely accepted the conveyances. If she had made an express promise to hold the title for the benefit of her husband or his heirs, and had afterwards repudiated it, under the decisions which have been cited she could not have been held to its performance against her claim of the benefit of the provisions of the statute of frauds. But no such promise is either alleged or proved, and the mere fact that her husband expected that she would permit him to control and dispose of the property would not create any trust in her for his benefit."

Under these rulings a mere promise to make a conveyance or to hold a title for the benefit of another is within the statute of frauds. It is apparent that the question here is whether defendant merely repudiated a promise or whether the conduct of defendant violated the conscience of equity by being so unfair and fraudulent as to remove the case from conventional promises and place it within the category of a trust which a court of equity creates for the prevention of wrongful advantage. In other words, there is presented the further question of whether, assuming that a parol contract was made, was there any such fiduciary relationship between plaintiff and defendant as would justify a court of equity in granting relief? Plaintiff and defendant were competitors in the oil fields; they were dealing at arms length in a contract for the drilling of an oil well for their mutual benefit. Assuming plaintiff's position to be correct, the most that defendant did was to promise that it would attempt to procure the Stevens lease and

if it succeeded would assign the same to plaintiff upon payment of $500. At most this was merely an executory oral contract, unaccompanied by fiduciary relationship, and therefore within those cases of which the statute of frauds prevents recognition.

Nor does the assertion of plaintiff that it would not send brokers into the territory to procure acreage alter this fact, for I find, as a fact, that this was a voluntary statement of plaintiff unaccompanied by any acceptance or agreement upon defendant's part.

To my mind the evidence discloses a further difficulty in plaintiff's way to success. Assuming that a contract was made between Giffel and Smith on the one hand and Ross on the other, the question arises as to authority of the former to bind their principal. Both defendant and plaintiff are corporations. Under the corporate records Giffel had no corporate authority to sell or to contract to procure for another and then to sell to or to contract for conveying oil acreage to another. Plaintiff says that there was a custom in Illinois to the effect that "land men" of oil companies had authority so to contract. This assertion was denied by defendant's evidence. There being no express authority, the only question is whether there was apparent authority in Giffel and Smith to make such a contract. The law indulges no presumption that an agency exists. It must be proved or inferred from facts proved. Authority must find its ultimate source in some act or omission of the principal. An agency is of itself of challenging character. It is a warning to one dealing with a supposed agent to ascertain at his peril whether the agent has the authority he assumes. The principal may create an apparent agency by commission or omission but to do so he must hold the agent out as his representative. He must do some act that clothes the supposed agent with apparent authority to do that which he does so that the principal will be estopped in law to deny that the agent has the authority claimed. I find none of these elements in the present record. Defendant at no time held out Giffel and Smith as its agents to bind defendant to contract to procure for and sell to a competitor any oil acreage. They had no actual authority and no apparent authority so to do. This plaintiff impliedly recognized. It relied upon no oral negotiations but prepared a written contract for the commitment of $2,000 for a dry hole and

said nothing whatever concerning any contract to procure acreage. The facts are such that it must be concluded that Giffel and Smith had no authority to make such a contract as plaintiff relies upon.

In view of my conclusion that the minds of the parties never met and that there was no parol contract as claimed, and my further conclusions that, if I err in this finding, the circumstances are such that no constructive trust came into existence; that defendant's representatives had no authority to make such a contract; that the contract, if made, was merely an executory promise unaccompanied by fraud or any proof of fiduciary relationship, and that the statute of frauds is a complete bar, the complaint must be and is dismissed for want of equity.

The findings and conclusions herein shall be considered a part of my more formal findings and conclusions adopted contemporaneously herewith.