234 F.2d 12
 A. M. AMEN et al., Appellants,
v.
William H. BLACK, Appellee.
A. M. AMEN et al., Appellants,
v.
William H. BLACK and Ruth F. Black, Appellees.
D. Arthur WALKER and Fred D. Windish, Co-Receivers of Black-Marshall Oil Company, Appellants,
v.
William H. BLACK and Ruth F. Black, Appellees.
 Nos. 4962-4964.
 United States Court of Appeals Tenth Circuit.
 May 4, 1956.
 Rehearing En Banc Denied June 19, 1956.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED D. Arthur Walker, Arkansas City, Kan., and Martin M. Lucente, Chicago, Ill. (Jack O. Brown, Chicago, Ill., Burrel Barash, Galesburg, Ill., Robert Martin, Wichita, Kan., Edward G. Knowles, Denver, Colo., W. F. Lilleston, Wichita, Kan., Douglas F. Smith, Chicago, Ill., and Henry V. Gott, Wichita, Kan., on the brief), for appellants.
 Malcom Miller, Wichita, Kan. (George B. Powers, Carl T. Smith, John F. Eberhardt, Stuart R. Carter, Robert C. Foulston, Robert N. Partridge and Robert M. Siefkin, Wichita, Kan., on the brief), for appellees.
 Before PHILLIPS, Chief Judge, MURRAH, Circuit Judge, and WALLACE, District Judge.
 MURRAH, Circuit Judge.
 
 
 1
 Stripped of their duplicity and redundancy, the pleadings in these consolidated cases state four separate contested claims with a common factual background.
 
 
 2
 The first is a spurious action by the appellant stockholders of the Black-Marshall Oil Company, generally known as the Aledo Group, who claim to have been induced to part with their stock in the company by the false and fraudulent representations of the appellee, Black, acting through his agent, Ives, to the effect that producing properties of the company were being sold to yield the stockholders $10 and $12 a share, when in truth and in fact, the properties were not being sold as represented, and were not sold until 1947, when Black had acquired all of the stock of the appellants with corporate funds; that after having so acquired the stock and retiring part of it, he sold the remaining majority stock to yield himself and his family $51.06 a share. The prayer is for a decree setting aside the sale of the stock to Black, and the recovery of the profits realized by him in a subsequent sale.
 
 
 3
 The second stated claim is in the nature of a derivative action by the individual stockholders and an original action by the co-receivers of Black-Marshall to recover on behalf of the corporation 32,457.50 shares of the company stock alleged to have been surreptitiously issued to Black and sold by him in 1947 for $51.06 a share. The consolidated claims seek to impress a constructive trust upon the proceeds of the sale of the stock for the benefit of the corporation and its shareholders.
 
 
 4
 The third claim asserted by the corporate receivers is for a recovery of the profits allegedly realized by Black and his wife from the use of company funds in personal business ventures. The fourth claim is also for proceeds realized by Black in transactions in which company funds were used for personal profit. This appeal is from a judgment of the trial court in favor of the defendants on all tendered issues.
 
 
 5
 A preliminary question is whether the claims of the appellant stockholders may be maintained as a spurious action under Rule 23(a) (3) of the Federal Rules of Civil Procedure, 28 U.S.C.A. The appellees challenge the propriety of the suit as such on the grounds that the claims being independent and based upon separate and distinct allegations of fraudulent representations, are not maintainable in one action.
 
 
 6
 The original complaint alleged requisite diversity of citizenship and amount in controversy and these jurisdictional elements are unchallenged. The other appellants are either parties plaintiff or interveners in one of the consolidated actions over which the court had jurisdiction. And while their claims and demands were separate, they alleged substantially the same facts and sought common relief. The court's jurisdiction of the original claim was not impaired or impeded by the subsequent interventions, irrespective of citizenship or amount claimed. Shipley v. Pittsburgh & Lake Erie Ry. Co., D.C., 70 F. Supp. 870; Dickinson v. Burnham, 2 Cir., 197 F.2d 973. The parties were multitudinous and the trial court commendably permitted them to join as plaintiffs or interveners in the several suits and consolidated the related litigation for trial and judgment as to each of the parties plaintiff or interveners. Indeed, this very situation was in the minds of the drafters when Rule 23(a) (3) was adopted. See Vol. 3, Moore's Federal Practice, p. 3448.
 
 
 7
 In a similar action by one of the Aledo Group of investors, we sustained the maintainability of the suit and thought that the plaintiff's proof standing alone showed that "Black did devise a scheme to defraud the stockholders of Black-Marshall * * * and that Ives was Black's agent in the perpetration of that scheme." Blazer v. Black, 10 Cir., 196 F.2d 139, 147. Based upon substantially the same pattern of proof, the trial court in this case made separate findings of fact with respect to the claims of specifically named appellants in which it found that in the summer of 1944 Ives falsely represented to these named appellants that the producing properties of Black-Marshall were being sold for an amount sufficient to yield the stockholders $10 per share; that the undeveloped properties of the company were being retained for development at a later propitious time; and that the stockholders should surrender fifty percent of their stock in order to bind the transaction. The court further found that in 1945 Ives falsely represented to the same appellants that the producing properties of Black-Marshall had been sold for which they should surrender the remainder of their stock for $12 per share. These representations were concededly false and undoubtedly induced the stockholders to part with their stock. The trial court further found, however, that Black did not solicit Ives to make such false representations and had no knowledge that they were being made as an inducement for the surrender of their stock. It was upon this basic finding that the trial court concluded that Ives was not Black's agent in the procurement of the stock; that Black was not therefore legally responsible for the false representations; and that he made no fraudulent representations to any of the plaintiffs and did not practice any fraud on any of them.
 
 
 8
 With respect to certain other specifically named appellants, hereafter noted and treated, the trial court found that no representations of any kind were made by any one to induce them to part with their stock.
 
 
 9
 We first consider whether Ives' false representations are legally imputable to Black, and in that regard the findings of the trial court on the disputed issues of fact are, of course, binding here; its ultimate appraisal of all the facts is entitled to great weight, and its conclusions thereon will not be disturbed unless from a consideration of the whole record we are convinced that they are clearly erroneous. United States v. United States Gypsum, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746; United States v. Waymire, 10 Cir., 202 F.2d 550; McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6; United States v. Oregon State Medical Society, 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978.
 
 
 10
 The pertinent facts are that in 1938, Black, an oil promoter, went to Aledo, Illinois, where he met a well-respected lawyer named Ives. Through Ives he met some of the appellants, business and professional men and women living in and around Aledo. As a result of these contacts, Black, with Ives as his lawyer, formed the Petroleum Investment Company, a voluntary association through which Black entered into separate contracts with the investors providing in substance that Black would use the funds entrusted to him by the respective investors in exploration for oil. The contracts in identical terms provided that Black would receive one-fourth of the profits from the ventures and that he would have unlimited powers of management of the affairs of the respective ventures.
 
 
 11
 Acting through Ives as his attorney and agent, Black received approximately $21,000, most of which came from the appellants herein. These funds were unsuccessfully invested in several oil ventures in Southern Illinois. In the early part of 1939, Black left Aledo apparently for California. While en route, he was involved in an automobile accident and awoke in a Tulsa, Oklahoma, hospital to find Deering J. Marshall at his bedside. He had had previous dealings with Marshall, and while convalescing in Tulsa, he and Marshall made arrangements to acquire some oil leases in Barton County, Kansas. The first lease, known as the Esfeld, was acquired by Marshall as a farmout from the Sohio Oil Company with funds furnished by Black. A producing well was completed on the lease in the early part of July. Thereafter Black and Marshall working together acquired four other leases in Barton County, Kansas, known as the Weber, Dolechek, Hoffman and Krier. These leases were partially developed as producing properties during the latter part of 1939.
 
 
 12
 While the leases were being acquired and developed, Black commenced negotiations with the Landowners Oil Association, composed of a group of Chicago investors, looking toward the pooling of the resources of the two companies into a corporation, the stock of which would be divided between the investors in the two groups based upon the value of their respective assets. During all of these negotiations Black kept Ives advised of all developments, including the five oil and gas leases in Kansas, and on December 7, 1939 rendered a financial statement to Ives setting out the receipt of the money from the Aledo Group, its investment and results.
 
 
 13
 Pursuant to plan, the Black-Marshall Oil Company was incorporated by Ives on January 3, 1940 as an Illinois corporation with an authorized capital of 20,000 shares of cumulative preferred stock with a par value of $10, and 200,000 shares of no par common. Stock was issued to the Aledo investors on a basis of one share of common for every $2 invested and one share of preferred for every $4 invested, including the amounts invested in the unsuccessful Petroleum Investment Company ventures in Southern Illinois. The five producing leases in Barton County, Kansas, together with other unproductive holdings were transferred to the corporation by Black and his associates, and the assets of the Landowners Association were also transferred to the corporation in consideration of 2,000 shares of preferred and 20,000 shares of common stock of the newly formed corporation. Black, Marshall and Ives were each issued 10,000 shares of common and 1,000 shares of preferred. At the first stockholders meeting in Aledo, Black was elected president, chairman of the board and chairman of the executive committee, and Ives was elected secretary and treasurer. Both acted in these capacities from the organization of the corporation to its dissolution upon the sale of its outstanding stock in 1947 to the National Cooperative Refinery Association. Some of the appellants here became directors of the corporation and remained such throughout the life of the corporation. The company first maintained offices in Wichita, and later in Great Bend, Kansas, near the location of the producing properties. The minute books of the corporation were kept by Ives in Aledo where the first meetings were held, but were later moved to Great Bend, Kansas, where the company offices were maintained.
 
 
 14
 The productive leases in Kansas were developed in 1940 to 1944 primarily with bank loans negotiated by Black with company credit and security. The leases were prolific and at the January, 1944 board meeting in Aledo, there was considerable agitation for a dividend or at least a partial return of investment in some form. Black explained that no dividends could be paid while the drilling program was under way, and that in any event it would not be advisable taxwise because the drilling operations were being carried on largely with tax money. Several resolutions and substitute resolutions were offered looking toward a partial realization upon the investment. Finally a resolution was adopted authorizing Black to negotiate a sale of the producing properties for an amount to yield the stockholders at least $8 per share and providing that the nonproducing properties would be retained for future development. Thereafter, and in the Spring of 1944, Black attempted to sell the producing properties of the company and entered into a tentative arrangement with N.C.R.A. for a loan secured by fifty-one percent of the company. When these negotiations failed, Ives wrote Black on May 14, 1944 expressing his regrets and also expressing the hope that they could make "some kind of a deal so that we can pay them [the stockholders] some money by the first of June, as they are expecting something at that time." He went on to say, "I am going to send you 440 shares of common stock which I purchased for you at $10.00 per share, but the owner must have his money by the 30th day of May", and that "I may be able to buy more of the stock at that price if you want it." A few days later, Black wrote Ives outlining his negotiations with N.C.R.A. expressing the view that he would eventually be able to make some kind of satisfactory arrangements with the co-op and asking Ives to prepare a directors' authorization "to consummate a deal with the co-op". Referring to the purchase of the stock of the Aledo Group, Black told Ives that it would not be possible to do anything by June 1, but that if they would sign a sales agreement giving him sixty days, he felt sure he could get the stockholders $10 a share. He was confident that he could secure a market for the stock provided there would be enough shares to "interest a purchaser who would be willing to make an investment substantial enough to warrant his taking some active part in the company." He referred to the arrival "next week" of some friends of Arthur Kincade from New York who were interested in such an investment. Ives was asked to write or wire the number of shares he thought could be acquired in Illinois so that Black would have some idea of what he would be able to offer the prospective purchasers.
 
 
 15
 Thereafter, and beginning in June of 1944, Ives contacted all of the Aledo Group, appellants here (except those hereafter noted) advising them that the producing properties of the company had been sold for an amount sufficient to return $10 per share, and that a deposit of fifty percent of the stock was necessary to evidence good faith; that the undeveloped properties of the company would be retained for development at a later propitious time.
 
 
 16
 When Ives had acquired fifty percent of the stock holdings of the Aledo Group at $10 per share, Black sent the company plane from Great Bend to Illinois and Ives delivered the stock to Black at Great Bend. 25,000 shares of stock were immediately transferred, 10,000 to Edward Roos, 10,000 to Richard Gill, and 5,000 to Arthur Kincade. The proceeds of this sale in the sum of $258,750 were transferred to Ives' stock account in Aledo. The remaining 11,714 shares were placed in Black's lock box as street stock. $80,121.64 of Black-Marshall funds were used to pay for this stock. It was first charged to Ives' account on the company books but was later charged to Black's account. The total purchase price was transferred to Ives' stock account in an Aledo bank from which the individual stockholders were paid at the rate of $10 per share. Apparently nothing further was said to the Aledo Group concerning the progress of the supposed sale, or for that matter, the progress of the company, until the following Summer of 1945, when Ives told the Aledo Group that the Black-Marshall Company had now been finally sold and that the stockholders should surrender the remainder of their stock to be paid at the rate of $12 per share.
 
 
 17
 Pursuant to these representations, the remainder of the stock was delivered to Ives and by Ives delivered to Black, who paid for it with Black-Marshall funds by separate vouchers to each of the stockholders. At this point in the course of events Black had in his possession and in his lock box the 11,714 shares of street stock acquired in 1944, the remaining one-half of the stock of the Aledo Group, and also 15,000 shares of Gill and Kincade stock which he had purchased with company funds for $17.50 per share. At about the same time Black negotiated a $3,200,000 loan with the N.C.R.A. under which Black-Marshall agreed to drill twelve producing wells each year for five years for an additional loan of $22,000 for each producing well so drilled. The company continued to prosper under the accelerated drilling program.
 
 
 18
 In preparation for the sale of a majority of the company stock to the N.C. R.A. in 1947, Black retired 56,000 shares of the street stock held in his lock box and thereby balanced his account with the company for the purchase price. With the 11,714 shares of Aledo stock transferred to himself in 1946, he then held in his name or in the name of his family 62,126 shares which he sold to N.C.R.A. for $51.06 a share. In addition, 3,000 shares held by Ives as executor of the Boyd Estate were also transferred to the N.C.R.A. for the same consideration per share. This gave N.C.R.A. a controlling stock interest, and it thereupon proceeded to dissolve the corporation, the other stockholders agreeing to convey their interest in the assets to N.C.R.A. for an amount equal to the $51.06 per share. Under the agreement of sale some of the company assets which the N.C.R.A. did not wish to acquire were sold to Black. The assets of the Landowners Oil Association were transferred to Black for the amount of the accounts receivable due the Black-Marshall Oil Company. From the total consideration of the sale of the stock to the N.C.R.A., Black and his wife received $234,928.74, Black individually $2,814,929.06, and Ives as executor of the Boyd Estate $135,930. In addition, an escrow fund of $497,819.21 was created of which Mrs. Black's interest was $39,123.29, Black's interest amounted to $357,224.50, and the Boyd Estate interest was $17,250.
 
 
 19
 It is suggested that Black purchased the stock upon the insistent demands of the Aledo Group; that he was hard put to find a buyer and this prompted him to use company funds to purchase the stock. It is true that in the Spring of 1944, Ives was being urged to find a market for the stock of some of the distressed investors and that Ives was in turn pressing Black for relief. And, it seems also fair to say that at that time Black was hard put to find a buyer for the stock. But it is also manifestly clear, we think, that some time in May or June of 1944 Black did find a market, and that market was in pursuance of a definite plan to eliminate the large family of stockholders, including the Aledo Group, and to acquire the stock or a majority of it in the effectuation of that plan. Henceforward Black became anxious to purchase all available stock, and Ives gathered in all of the stock of the Aledo Group and delivered it to Black, according to what we believe to be a well-laid plan. The whole course of events is inconsistent with the idea that Black purchased the stock in response to the sporadic demands of the stockholders.
 
 
 20
 It may be that Black did not instruct Ives what to tell the Aledo Group in order to get the stock. Indeed, for the purposes of agency, we may assume that he did not know that false representations were being made. It is manifestly clear, however, from Black's own words and conduct, that Ives acted as his agent in the procurement of the stock both in 1944 and 1945. And it is a familiar and universally accepted rule that a principal is liable for the frauds and misrepresentations of his agent within the scope of his authority or employment even though he had no knowledge of such representations. Otherwise stated, "although the principal may not have actually authorized the particular fraudulent act, yet he is responsible for the fraud of the agent if he has entrusted to the agent a matter which puts the agent in a position to perpetrate the fraud complained of while the agent is executing the agency transaction within the scope of his employment." 2 Am.Jur., Agency, § 363; see also Restatement Agency, § 261; Anheuser-Busch v. Grovier-Starr Produce Co., 10 Cir., 128 F.2d 146; Cox v. Pabst Brewing Co., 10 Cir., 128 F.2d 468; Siedhoff v. Campbell, 141 Kan. 255, 40 P.2d 404. The principal is liable to one who relies upon the deceitful representations of the agent, "if those representations are apparently authorized, or usually accompany or are incidental to transactions which he is authorized to conduct, provided the other party has no notice that the representations are unauthorized." 2 Am.Jur., Agency, § 362; see also Restatement Agency, §§ 257, 258.
 
 
 21
 Moreover, the record shows without much doubt that Black knew of Ives' false representations and with such knowledge accepted the benefits without raising a hand to repudiate or deny them. Indeed, the court found that on November 10, 1945, Ives advised Black of the misrepresentations and that Black took no action thereon. The record shows other specific instances in which Ives' representations were brought home to Black.[1] In their brief the appellees concede that Black learned of Ives' misrepresentations in the Fall of 1945 but exonerate him by saying that he did not know what to do about it. But, "He ratifies who does not restore." Maryland Casualty Co. v. Beebe, 10 Cir., 54 F.2d 743, 746, and cases cited. Black kept the stock with knowledge of the fraud. His profits from the sale were the fruits of the fraud, and equity will require him to account. The record is barren of any benefits to Ives.
 
 
 22
 Quite apart from the naked principles of agency, we think there are even stronger reasons for holding Black responsible for the misrepresentations which induced the Aledo Group to part with their stock. The evidence conclusively shows that Black himself stood in a position of trust and confidence to the Aledo Group and he cannot insulate himself from the fraud by denying Ives' agency. From the very beginning the Aledo investors entrusted their funds to Black with unlimited powers of management. When the Group was incorporated for the continuation of their joint venture, Black became the president, chairman of the board and chairman of the executive committee. True, some of the Aledo Group were made directors of the company, but they took no part in the management of its affairs. For all practical purposes Black was the corporation; he did with it as he saw fit, and the stockholders followed him with almost blind loyalty, as evidenced by the facility by which Ives was enabled to obtain almost fifty percent of their stock in 1944 and the remainder in 1945. Ives was, in the last analysis, only the conduit through which Black dealt with the Aledo Group. Having established this confidential relationship, he owed them the duty at least to be truthful with respect to all corporate transactions. Whether we apply the Kansas strict accountability rule, see Blazer v. Black, 10 Cir., 196 F.2d 139, or the less stringent rule applicable in Illinois, see Agatucci v. Corradi, 327 Ill.App. 153, 63 N.E.2d 630; Dunnett v. Arn, 10 Cir., 71 F.2d 912, equity will not condone fraudulent representations under which one standing in a confidential relationship is enabled to take advantage of another. See Auer v. Wm. Meyer Co., 322 Ill.App. 244, 54 N.E.2d 394. In these circumstances, equity prescribes a standard of rectitude quite above the ethics of the bargaining counter. 54 Am.Jur., Trusts, §§ 220, 225 and 226; Securities and Exchange Commission v. Chenery, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626; Manufacturers Trust Co. v. Becker, 338 U.S. 304, 70 S.Ct. 127, 94 L.Ed. 107. It will intervene to declare the wrongdoer a trustee and hold him accountable for the fruits of his inequitable conduct. Falk v. Hoffman, 233 N.Y. 199, 135 N.E. 243. In equity the stockholders remain the owners of their shares with the right to participate in the proceeds of the sale in the proportion that their stock ownership bears to the total stock entitled to participate in the assets of the company at the time of sale, less of course the amounts heretofore paid on the sale price in 1944 and 1945. Dunnett v. Arn, supra, 71 F.2d at page 920; Blazer v. Black, supra.
 
 
 23
 Appellees say that in any event the value of the stock of the company in 1944 and 1945 was not more than that which the Aledo Group received, and having received the full value of their stock they could have no complaint. The trial court so found and so held. But the value of the stock at the time it was fraudulently obtained is not the measure of relief in equity. Recovery is predicated upon the equitable principle of unjust enrichment, not upon the theory of provable damages. Dunnett v. Arn, supra, Blazer v. Black, supra; Falk v. Hoffman, supra. In these circumstances, equity will impress a trust upon the stock and constitute Black a trustee for the profits he reaped from the date he received it until he finally sold it or retired it.
 
 
 24
 Reverting now to those parties to the suits who were beneficially excluded from the trial court's affirmative findings of misrepresentation on the part of Ives, we must consider each claim upon its own factual footing and of course accord due weight to the negative findings of the trial court with respect to those particular parties. Hokin, Jones, Bowers, Nelson, Elving and Ogle did not appeal from the adverse judgment and their claims are not before us. With respect to the parties falling within this category who have appealed and who may be classified as members of the Aledo Group, we ought to consider the correctness of the findings and conclusions of the trial court against the factual background of Ives' established relationship to the Group. It is important to keep in mind the fact that to most of the appellants he was a personal friend, attorney and confidant. And it was through this relationship that the Aledo Group was induced to purchase stock, first in the Petroleum Investment Company and later in the Black-Marshall Company; and it was through this same confidential medium that he was enabled to marshal one-half of the stock in 1944 and the other half in 1945, in consummation of what we hold to be Black's scheme to defraud. We have the oral and written word of Ives that he made the same representations to all of the Aledo Group of investors whom he contacted in the effectuation of the scheme. Indeed, the credited testimony of the witnesses indisputably shows a general pattern of action into which all of the Aledo Group of appellants fall with only insignificant factual variance.
 
 
 25
 Ives had no direct contact with either Amen or Baldwin. Amen lived in Yankton, South Dakota. Baldwin lived in Rock Island, Illinois. All of their transactions with Black-Marshall were through Dr. Danford, a prominent member of the Aledo Group and a large stockholder. It was through Dr. Danford that both Amen and Baldwin were induced to purchase stock. Baldwin left his stock in Danford's lock box. Ives was an old and trusted friend of Danford, and when in June of 1944 Ives set out to acquire one-half of the stock of the Aledo Group he immediately contacted Danford and by false and fraudulent representations induced him to part with one-half of his stock. At the same time he induced Danford to procure Amen's and Baldwin's stock. Pursuant to these directions and representations, Danford did secure their stock along with his own. Whether Danford acted as Ives' agent or as agent for Baldwin and Amen, they undoubtedly relied upon Ives' false representations to Danford, and as we have said, Black is liable for the misrepresentations of his agent, Ives, to Danford. See Restatement, Agency § 315.
 
 
 26
 Testifying in her own behalf, Edith Hall told substantially the same story as other appellants whose testimony was credited in the court's affirmative findings of misrepresentations. It is true that her memory failed her on cross examination, but we have Ives' word that he made the same representations to her as to other members of the Aledo Group whose testimony has been credited in accordance with the established pattern of proof. We think there can be no valid exception to Mrs. Hall's claim when considered in the context of the whole record.
 
 
 27
 McBride did not testify in his own behalf and the only proof of actionable misrepresentation is Ives' general statement to the effect that he made the same representations to all of the Aledo Group, including McBride. In the absence of any direct proof of fraudulent misrepresentations or reliance upon the general pattern, we will not overturn the trial court's findings in that regard.
 
 
 28
 We hold, therefore, that appellants Amen, Baldwin and Hall are entitled to participate in the proceeds of the sale of the company in proportion to their equitable stock holdings at the time of the sale along with the other appellants as to whom the trial court found Ives made misrepresentations, and as to whom we have said Black was liable as responsible principal and unfaithful trustee.
 
 
 29
 This brings us to the corporate claims, and more particularly to the right of Black to participate in the proceeds of the sale to the N.C.R.A. on the basis of the 32,457.50 shares of stock which the appellants contend should be denied participation because fraudulently issued to Black as a promoter's illegal secret profit.
 
 
 30
 Inasmuch as the appellants do not seek to set aside the 1947 sale of stock to the N.C.R.A. by Black, but rather to impress a trust upon the proceeds of the sale, and constitute Black as trustee therefor, they ceased to be either legal or equitable stockholders upon the consummation of the sale, and consequently have no capacity to maintain a derivative action on behalf of the corporation for the redress of corporate wrongs. This is true, even though the wrongs complained of were committed while they were either legal or equitable stockholders. Hanna v. Lyon, 179 N.Y. 107, 71 N.E. 778; 3 Fletcher, Cyclopedia of Corporations, Sec. 1286, page 988.
 
 
 31
 And while the corporate receivers may have capacity to maintain the suit on behalf of the dissolved corporation because of the invulnerability of the order of the Illinois Federal Court setting aside the corporate dissolution; 16 Fletcher, Cyclopedia of Corporations, Sec. 7764, page 223; 19 C.J.S., Corporations, § 1693, pp. 1460-1461; Town of Vandalia v. St. Louis, V. & T. H. R. Co., 209 Ill. 73, 70 N.E. 662; Blanchard Bro. & Lane v. S. G. Gay Co., 289 Ill. 413, 124 N.E. 616; Miller v. Union State Inv. Co., 326 Ill.App. 460, 61 N.E.2d 764; Badger v. Hoidale, 8 Cir., 88 F. 2d 208, 109 A.L.R. 798; yet equity, looking at the substance of the proceedings, will make sure that the beneficiaries of the corporate redress are equitably entitled to the fruits of its processes. In the language of Judge Pound in Home Fire Ins. Co. v. Barber, 67 Neb. 644, 93 N.W. 1024, 1033, 60 L.R.A. 927: "* * * When the corporation comes into equity and seeks equitable relief, we ought to look at the substance of the proceedings, and, if the beneficiaries of the judgment sought have no standing in equity to recover, we ought not to become befogged by the fiction of corporate individuality, and apply the principles of equity to reach an inequitable result."
 
 
 32
 Looking at the substance of the corporate claims and the beneficiaries thereof, it becomes readily apparent that the principal beneficiary of any recovery on behalf of the corporation would be the N.C.R.A. who became the principal stockholder upon the purchase of a majority of the stock in 1947. And having purchased the stock of the corporation from Black in an arms length transaction, and having received the full value of its purchase, any recovery as stockholder beneficiary of the dissolved corporation would be tantamount to recoupment of the legitimate purchase price of the stock. Obviously there are no equities in such a result, and we therefore hold that the corporate claims must fail for lack of standing to maintain the suit and for want of equity on the part of the beneficiaries in any corporate recovery. And see Home Fire Ins. Co. v. Barber, supra.
 
 
 33
 But the failure of the corporate claims in nowise militates against the standing of the former stockholders entitled to participate in the proceeds of the sale from contesting the right of Black or any one else to participate in the fund which equity has created by raising a trust and constituting Black as trustee therefor ex maleficio. The appellants, former stockholders, seek to set aside the issuance of 32,457.50 shares of stock to Black on the grounds that they were fraudulently issued to him, and thus recover the proceeds of the sale of that stock for themselves and those equitably entitled to participate therein. They sought relief through the medium of the corporation. But looking at the real parties in interest to the fund, equity will recognize the standing of the beneficiaries to contest the rights of others also claiming an interest by virtue of stock ownership at the time of the 1947 sale. The court has jurisdiction of the proceeds of the sale; it has jurisdiction of the parties; and Black is being required to account to the defrauded stockholders as equitable owners of the stock he sold to the N.C.R.A., as an incident to equitable accounting and the achievement of complete justice. The court may assuredly determine the rightful ownership of all the stock entitled to participate in the proceeds of the 1947 sale, and in so doing, it will not be restrained by mere forms of action or niceties of pleadings. See 30 C.J.S., Equity, §§ 67 and 68, pp. 414-421; 19 Am.Jur., Equity, § 127, page 126.
 
 
 34
 The facts leading up to the organization of the corporation in January of 1940 and the issuance of the stock are reasonably clear to the effect that sometime in the early Fall of 1939 Black discussed with Ives his plan to organize a corporation so that they could operate "as a company instead of as an individual". In November of 1939, Black proposed to the board of directors of Landowners Association to take 4,000 shares of preferred and 40,000 shares of common stock of the proposed corporation in full payment of the properties held by Black and "his associates" to be transferred to the corporation, including the five Barton County, Kansas oil and gas leases. When the corporation was organized by Ives in Aledo in January, 1940, these five Barton County, Kansas oil and gas leases were formally transferred to the corporation. The properties of Landowners were also transferred in consideration of 20,000 shares of common and 2,000 shares of preferred stock of the newly formed corporation. The number one stock certificates for 10,000 shares of common stock and 1,000 shares of preferred stock were issued to Black. Certificates numbered two for like amounts were issued to Marshall; certificates numbered three for like amounts were issued to Boyd; and certificates numbered four for like amounts were issued to Ives. At the same time the Aledo Group were issued preferred and common stock on the basis of one share of common stock for each $2 invested with Black prior to the formation of Black-Marshall and one share of preferred stock for each $4 so invested. These certificates were signed by Black as president and Ives as secretary. Certificates numbered 5 to 14, inclusive, in the total amount of 64,870 shares of common stock were issued to "W. H. Black et al" and signed by Black but not by secretary Ives. Revenue stamps were affixed and cancelled. When one of the former stockholders in the Landowners Group discovered that this large block of stock had been issued to "Black et al", he complained of the issuance of the stock as a violation of the preorganization agreement fixing the ratio of the stock ownership in the new company based upon the respective properties transferred. Some time thereafter these stock certificates (5 to 14, inclusive) were repasted into the stock book. No one came forward to say who issued the certificates, under what circumstances, or who repasted them in the stock book. The stubs were not in secretary Ives' handwriting. Black testified that upon the formation of the corporation he signed all of the stock certificates in blank and could not explain how they happened to be issued to him. He denied that they had been validly issued to him, or for that matter that they had been validly issued at all.
 
 
 35
 The minutes of the first annual stockholders meeting held at Aledo, Illinois, January 17, 1941 over which Black presided, showed that he owned 11,000 shares of the corporation stock (1,000 shares of preferred and 10,000 shares of common). Apparently, however, immediately after that meeting the "Black et al" stock was reissued as certificates numbered 155 to 166, inclusive. Each certificate, signed by Black as president and Ives as secretary, contained a notation "correction of name only". When Black was pressed for an explanation concerning the circumstances under which the 64,870 shares of stock were reissued to him, he simply stated "I don't propose to explain it, because I can't explain it, sir."
 
 
 36
 Black now contends that the 64,870 shares of stock were issued to him and Marshall in consideration of the transfer of the five Barton County oil and gas leases which they had acquired and partially developed as a partnership, independent of the Aledo investors. But the undisputed facts are that the five Barton County leases were transferred to the corporation in consideration of 40,000 shares of common and 4,000 shares of preferred stock and that this same amount of stock was represented by the first four certificates issued to Black, Marshall, Boyd and Ives. They thereby received the full consideration for the five leases in accordance with the preorganization agreement. There is no evidence whatever that Black contributed anything else to the corporation for which he and Marshall would be entitled to receive 64,870 shares of stock. We do not understand any one to so contend. Moreover, the evidence shows without dispute that beginning in the early fall of 1939, the Aledo Group transmitted funds to Black through Ives and that these funds were used for the acquisition and development of the five leases. It is true that the Esfeld lease was acquired in July and a well drilled thereon during which time Black did not receive any funds directly from the Aledo Group. And Black undoubtedly used outside funds with which to acquire the lease and drill a well thereon. But the record is also clear that Black acknowledged the Aledo Group's interest in all of these leases. On December 7, 1949 he made a detailed report to Ives of monies received and spent in the acquisition and development of these valuable leases. The report showed that as of that date the Aledo Group had contributed $17,650 of a total of $28,415 expended. $8,000 ($3,000 for the Krier lease and $5,000 on a drilling contract) was due and unpaid and apparently was assumed by the corporation upon its organization in January, 1940. Other sums were contributed by the Aledo Group between December 7, 1939 and the date of organization of the corporation; and in answer to interrogatories, Black acknowledged receipt of approximately $30,000 from the Aledo Group, all of which was used in the acquisition and development of these five leases.
 
 
 37
 From these facts it is clear that each party received stock consideration for his investment in accordance with the pre-organization agreement. The Landowners Association received their stock; Black, Marshall, Boyd and Ives received their stock for their interests in the Barton County leases; the Aledo Group received stock for their investment; and the 64,870 shares, of which 32,457.50 were issued to Black and sold to N.C.R.A., could be nothing but purely promotional stock. And it is also clear beyond doubt that it was issued surreptitiously, covertly, and we say fraudulently, to Black.
 
 
 38
 Nor do we believe that the asserted claims are barred by the Kansas statute of limitations or analogous laches. Under the Kansas statute, an action for relief on the grounds of fraud may be brought at any time within two years after accrual; and it does not accrue until the discovery of the fraud, Sec. 60-306, Kan.Gen.St.1949, meaning the "discovery of such facts as would, on reasonable diligent investigation, lead to knowledge of the fraud." Sauberli v. Sledd, 1936, 143 Kan. 350, 55 P.2d 415, 419, and cases cited; Dalton v. Hill, 1950, 169 Kan. 388, 219 P.2d 710, 716; Lewis v. Duncan, 1903, 66 Kan. 306, 71 P. 577. And while this suit is in equity invoking equitable remedies, the statute of limitations governing relief on the grounds of fraud is applicable rather than laches, notwithstanding what we said in Blazer v. Black, 10 Cir., 196 F.2d 139, 147. See Dalton v. Lawrence Nat. Bank, 1950, 169 Kan. 401, 219 P.2d 719; Guilfoyle v. Brown, 1939, 149 Kan. 615, 88 P.2d 1082; Hughes v. Reed, 10 Cir., 46 F.2d 435; Curtis v. Connly, 257 U.S. 260, 42 S.Ct. 100, 66 L.Ed. 222; Annotation, 174 A.L.R. 1217, 1226, Sec. 5; 34 Am.Jur., Lim. of Actions, § 59, page 55.
 
 
 39
 The record is conclusive that the appealing shareholders did not personally have knowledge of the perpetrated fraud and equally convincing that the individual appellants cannot be charged with having failed to use due diligence to discover such fraud. In determining whether reasonable diligence was exercised for the purpose of discovering fraud, one of the most important determinants is the relationship of the parties. As we have seen, the record conclusively establishes a fiducial relationship between Black and the appellants as former stockholders. And the law does not require one to suspect his fiduciary. Surely no one would contend that the Kansas statute of limitations was intended to impose upon the defrauded party the burden of discovering a fraud perpetrated by one standing in a position of trust and confidence. Indeed, some courts excuse the failure to use diligence in the face of a relationship of trust and confidence rendering it the duty of the party committing the fraud to disclose the truth to the other. Auer v. Wm. Meyer Co., 1944, 322 Ill.App. 244, 54 N.E.2d 394. Cf. Michelsen v. Penney, 2 Cir., 135 F.2d 409. In the language of the Kansas court, "A party, even though his suspicions have been aroused, may well be lulled into confidence, and take no action by such representations as were made." Dalton v. Hill, 169 Kan. 388, 219 P.2d 710, 716. And, "Only where a party defrauded would plainly have discovered the fraud except for his own inexcusable inattention, will he be charged with a discovery in advance of actual knowledge on his part." Connell v. Saco Oil Co., 170 Kan. 91, 223 P.2d 1020, 1027. See also Dalton v. Lawrence Nat. Bank, supra.
 
 
 40
 The successful appealing shareholders are entitled to money judgments against Black equal to the values of their equitable stock holdings in Black-Marshall sold to N.C.R.A. in 1947, less sums already received for such interests.
 
 
 41
 To determine the amount each successful appellant is entitled to recover, the trial court should apply in essence, the following formula: First, inquiry must be made to establish the number of validly issued shares of stock involved in the 1947 sale. Then, the value of each valid share so participating should be obtained by dividing the total dollar consideration paid by N.C.R.A. for the Black-Marshall assets by the number of such validly issued shares. Each shareholder is then entitled to judgment equal to the number of shares fraudulently procured by Black, less the amounts paid by Black to each shareholder in the fraudulent 1944-1945 transactions.
 
 
 42
 Validly issued shares involved in the 1947 sale must include any shares arbitrarily retired by Black prior to such sale, and of course must exclude the stock fictitiously issued, inasmuch as such fictitious issue is not entitled to share in the sale proceeds. And, the trial court in making these determinations should keep in mind that the overall object in view is to ignore any superficial book transactions and compensate appellant-stockholders in relation to their actual interests in the 1947 sale as evidenced by the number of shares fraudulently procured from them.
 
 
 43
 The judgment of the trial court is reversed and the causes remanded with directions to proceed in accordance with the views herein expressed.
 
 
 
 Notes:
 
 
 [1]
 Examples of Black's knowledge of Ives' misrepresentations to members of the Aledo Group and consequent ratification are: (a) Between the time the first one-half of appellants' stock was acquired and the acquisition of the second one-half, Black made the same general representations to Sherrard, specifically mentioning that only "producing properties" were beingsold, and that undeveloped properties of Landowners were being retained "and this property that we weren't selling, we had to keep for a period of two years". (b) In the early Fall of 1945 when Dr. Wadleigh wrote Black inquiring into the details of the transaction, Black asked Ives what should be said. In response Ives wrote Black: "Regarding the Wadleigh letter I would suggest that you write and tell him that the entire assets of the Black-Marshall Oil Company were sold except the property not developed in the Landowners Royalty Company which cannot be developed for two years due to our tax situation under the sale. I have told the others the same thing." (c) When the Constants inquired of Black on November 21, 1945, Black failed to make a true disclosure, but wrote the Constants that the details were so complicated he would have to talk with them in person when he came to California "over the holidays". Conveniently, Black never looked up the Constants or made any effort to convey the true facts to them regarding the sale. (d) All acquired stock was kept in Black's lock box and was subject to his absolute control, yet he failed to take any steps to correct such misrepresentation, at a time when it would have been a simple matter to correct things with the shareholders. Indeed, with such knowledge, he transferred to himself under Certificate No. 398, 11,714 shares of stock which had been held in his lock box as street stock since 1944.
 
 
 
 44
 PHILLIPS, Circuit Judge (dissenting in part).
 
 
 45
 Plaintiffs below have appealed from a single judgment adverse to them, entered in three cases, which had been consolidated for trial.
 
 
 46
 On June 28, 1949, Amen commenced an action in the United States District Court for the District of Kansas, numbered 3495 on the docket of such court, against William H. Black and Dale G. Ives. There were other defendants whose presence as parties is no longer material.
 
 
 47
 The action was brought as a class action for the benefit of Amen and all other stockholders of the Black-Marshall Oil Company, an Illinois corporation, hereinafter called the B-M Company, similarly situated. Certain former stockholders in the B-M Company intervened. In an amended complaint it was alleged that Black and Ives entered into a conspiracy to acquire the stock and assets of the B-M Company for Black's own use and benefit; that Black and Ives falsely represented to the plaintiffs that a sale of a large portion of the assets of the B-M Company had been arranged for an amount equal to $11 per share; that certain undeveloped oil and gas leases of the B-M Company would not be included in the sale, but would be retained for the benefit of the stockholders of the B-M Company; that induced by such false representations the plaintiffs, in 1944 and 1945, endorsed in blank and delivered to Black and Ives stock certificates representing their respective shares in the B-M Company and received therefor $11 per share; that Black and Ives effected a sale of the stock and assets of the B-M Company to the National Cooperative Refinery Association, hereinafter referred to as the Cooperative Association, at a price, which, when prorated among the shareholders of the B-M Company, excluding the plaintiffs, resulted in a distributive portion per share substantially in excess of the price paid by Black and Marshall to the plaintiffs for their shares. The plaintiffs did not learn of such fraudulent conspiracy and acts until May, 1949. The plaintiffs prayed for the recovery of their proper and lawful distributive shares of the purchase price paid by the Cooperative Association for stock in the B-M Company.
 
 
 48
 It was further alleged in the amended complaint that Black caused to be issued to himself for his benefit, at the time of the original issue of the stock of the B-M Company, shares of stock for which Black gave no consideration, and that Black withdrew large sums of money from the treasury of the B-M Company for his own use and benefit and employed B-M Company funds to finance his personal business ventures. For the alleged wrongs to the corporation, Amen and the interveners prayed for relief on behalf of the corporation.
 
 
 49
 On September 25, 1950, Walker and Windish, co-receivers of the B-M Company, filed a complaint in intervention in No. 3495 in which they alleged that Black, at the time of the original issue of stock in the B-M Company, caused to be issued and transferred to him shares in the B-M Company for which he paid no consideration, and that Black withdrew large sums of money from the treasury of the B-M Company for purposes other than proper corporate purposes and for his own use and benefit and to finance his personal business ventures for his personal profit. The co-receivers prayed for relief on behalf of the corporation.
 
 
 50
 On July 14, 1950, the co-receivers filed an action in the United States District Court for the District of Kansas, numbered W-143 on the docket of such court, against William H. Black, in which they alleged substantially the same facts as they had alleged in the intervening petition in No. 3495, and sought redress from the defendant on account of the stock alleged to have been issued to Black without consideration and the use of funds of the B-M Company by Black for his personal benefit.
 
 
 51
 Prior to July 15, 1949, Amen, Wadleigh, Danford, Robinson, Hall and Riley commenced an action in the District Court of McPherson County, Kansas, against William H. Black and other defendants, whose presence as parties is no longer material. The action was brought for the benefit of the plaintiffs and all other stockholders of the B-M Company similarly situated. On the date last mentioned, such action was removed by the defendant to the United States District Court for the District of Kansas, where it was numbered 3509 on the docket of that court. On July 25, 1950, an amended complaint was filed in No. 3509, which alleged essentially the same facts as those alleged in the amended complaint in No. 3495.
 
 
 52
 Thus, it will be seen that in No. 3495 and No. 3509 certain former stockholders in the B-M Company, either as parties plaintiff or as interveners, sought relief in their individual behalf from William H. Black on account of the alleged fraudulent representations that a sale of the assets of the B-M Company had been effected, whereby they were induced to deliver their stock endorsed in blank to William H. Black, who subsequently sold such stock to the Cooperative Association at a much larger price per share. They, in effect, affirmed the sale of their stock to Black and prayed that Black be required to account for the moneys he received from the sale of the stock of plaintiffs and interveners to the Cooperative Association. It will be further observed that the plaintiffs and interveners in No. 3495 and No. 3509 undertook to join with their original action a stockholders' derivative action in which they sought to recover on behalf of the B-M Company for the injuries to the B-M Company alleged to have resulted from the issue of stock to Black without consideration and the alleged use by Black of the corporate funds for his personal benefit.
 
 
 53
 At the close of plaintiffs' evidence in the trial below, the co-receivers who had intervened in No. 3495 elected to stand upon their action No. W-143 for redress of the alleged wrongs to the B-M Company.
 
 
 54
 Many of the individual plaintiffs and interveners in No. 3495 and No. 3509 resided in, or in the vicinity of Aledo, Illinois, and may be referred to as the Aledo Group.
 
 
 55
 Involved in the consolidated actions were four claims:
 
 
 56
 1. The claim of the Aledo Group against William H. Black, predicated on the alleged false representations of Black, acting through his agent, Ives, to recover the amount that Black received from the sale of the stock of the Aledo Group to the Cooperative Association in excess of the $10 and $12 per share, respectively, which the Aledo Group received from their stock;
 
 
 57
 2. The claim in the nature of a derivative action by the original stockholders and an original action by the co-receivers to recover on behalf of the corporation on account of 32,457.5 shares of stock alleged to have been issued to Black without consideration and sold by him in 1947 to the Cooperative Association for $51.06 a share;
 
 
 58
 3. A claim asserted by the co-receivers for recovery of profits alleged to have been realized by Black from the use of B-M Company funds in personal business ventures; and
 
 
 59
 4. The claim of the co-receivers for profits realized by William H. Black for transactions in which B-M Company funds were used for Black's personal profit.
 
 
 60
 That Ives made the alleged false representations with respect to the sale of the assets of the B-M Company to members of the Aledo Group is conceded. The trial court found that such representations were made by Ives without solicitation by William H. Black and without the knowledge of William H. Black. However, Black testified that he told the Aledo Group that Ives was his agent in all matters with respect to the B-M Company, and especially for the purpose of furnishing information to the Aledo Group. Therefore, it is my opinion that Black was estopped to deny Ives' agency and that Ives had apparent or ostensible authority to furnish information on Black's behalf to the Aledo Group with respect to the B-M Company and that the representations made by Ives to the Aledo Group were within the scope of the apparent or ostensible authority of Ives and Black was bound thereby.[1] On that ground and that ground alone, I concur in the majority opinion, insofar as it reversed the judgment below, with respect to the claim of the Aledo Group to recover from William H. Black for the injuries suffered by the Aledo Group on account of the alleged false and fraudulent representations of Ives.
 
 
 61
 The majority opinion affirms the judgment below, with respect to the third and fourth claims. It also affirms the judgment below, with respect to the derivative stockholders' action (Claim Two) and the claims asserted by the co-receivers in cause No. W-143. However, on a theory which, in my opinion, has neither basis in law nor justification in equity, the majority opinion holds that the Aledo Group may obtain redress against William H. Black for the wrong alleged to have resulted to the corporation from the issuance to William H. Black of the 32,457.5 shares of stock.
 
 
 62
 The Petroleum Investment Company was a partnership or a joint venture, formed in 1938. Its members were Black, Ives and the members of the Aledo Group. From $21,000 invested in the venture by members of the Aledo Group, nine dry holes were drilled in Illinois and Indiana. That unsuccessful venture was completed in early 1939. Thereafter, in the spring of 1939, William H. Black and D. J. Marshall formed a partnership, which thereafter acquired five oil and gas leases in Kansas. That partnership drilled a well on a lease known as the Esfeld lease, which came in as a producer in July, 1939, and established such lease as one of the most valuable leases in the State of Kansas. The funds for acquiring the lease and drilling and equipping such well were furnished by Black and Marshall, with the exception of $9,000, which Black borrowed on his own credit and which was ultimately assumed by the B-M Company.
 
 
 63
 Up to August 23, 1939, the Aledo Group made no advancements of funds to the Black-Marshall partnership. After the Esfeld lease had been developed as a commercial producer and from August 23, 1939, to December 7, 1939, the Aledo Group advanced to the partnership $17,650 and Black advanced $28,415. Subsequent to the latter date, the Aledo Group advanced additional funds, both before and after the incorporation of the B-M Company, to carry on the development of the Kansas leases.
 
 
 64
 The first meeting of the incorporators of the B-M Company was held in Aledo, Illinois on January 11, 1940. The minutes of that meeting recite that the chairman presented a subscription agreement bearing subscriptions for 122,500 shares of common stock and 9,055 shares of preferred stock of the B-M Company and that a resolution was unanimously passed accepting such subscriptions on behalf of the corporation. At the same meeting a proposal was presented from the Landowners Oil Association, owned by a Chicago, Illinois group, to exchange at least 75 per cent of the outstanding stock of Landowners for 20,000 shares of common stock and 2,000 shares of preferred stock of the B-M Company and that a resolution was adopted approving such proposal.
 
 
 65
 The five Kansas leases were assigned to the B-M Company in exchange for the entire subscription of 122,500 shares of common stock and 9,055 shares of preferred stock. Undoubtedly, it was originally contemplated that 10,000 shares of common stock and 1,000 shares of preferred stock would be issued to Black and 10,000 shares of common stock and 1,000 shares of preferred stock would be issued to Marshall, but it developed that Black and Marshall were unwilling to assign the leases to the B-M Company, unless they received, in addition to the 20,000 shares of common stock and 2,000 shares of preferred stock, 64,870 shares of common stock.
 
 
 66
 Black signed the stock certificates in blank. The certificates for 64,870 shares made out to Black, et al. (The omission of Marshall's name was for reasons personal to Marshall) were not signed by Ives and not actually delivered to Black and thereafter Ives reissued such stock to Black and Marshall at about the time of the stockholders' meeting January 1, 1941, to enable Black to transfer to members of the Aledo Group a portion of such shares, which they had purchased from Black. While Black admitted he could not explain why Ives failed to sign the original certificates made out to Black, et al., his testimony made it very clear that Black and Marshall were unwilling to assign the Kansas leases for 20,000 shares of common stock and 2,000 shares of preferred stock.
 
 
 67
 Common stock was issued to the investors in the Petroleum Investment Company on the basis of one share of common for each $2 invested, and one share of preferred for each $4 invested, both in the Illinois venture and by advancements to the Black-Marshall partnership in Kansas.
 
 
 68
 Certainly, Marshall was under no obligation, legal or moral, to bail the Aledo Group out from their non-profitable venture in Illinois. No wrongdoing by Black with respect to the Illinois venture was claimed, and it follows that Black was under no legal or moral duty to aid the Aledo Group in recouping their losses in the Illinois venture. Under all the facts and circumstances, it is a reasonable inference that Black and Marshall would be unwilling to assign the Kansas leases in exchange for 20,000 shares of common stock and 2,000 shares of preferred stock.
 
 
 69
 The original five directors of B-M Company were Black, Marshall and three members of the Aledo Group; Ives, Boyd and Stevenson. At the second annual meeting of the stockholders of the B-M Company, held in January, 1941, Black and Marshall and five members of the Aledo Group; Ives, Stevenson, Berglund, L. E. Robinson and Sherrard were elected as directors of the B-M Company. At the annual meeting of the directors, held on January 7, 1941, an audit report covering the first fiscal year, ending July 31, 1940, was examined and approved. Such audit report showed that on January 20, 1940, the Board of Directors authorized the issuance of 122,500 shares of common stock, including the 64,870 shares of stock issued to Black and Marshall in exchange for five leases and the assumption by the corporation of liability existing against the said leases in the amount of $8,827.93. At the next annual meeting of the board of directors, held in 1942, when the directors were Black and Marshall and Ives, Berglund and Sherrard of the Aledo Group and Allen James of the Landowners Corporation, an audit report for the period ending July 31, 1941, was examined and approved. That audit report also showed the issuance of the above-mentioned shares. At the next annual meeting of the board of directors, held in January, 1943, when the directors were Black and Marshall and Ives, Berglund and Sherrard of the Aledo Group and Ranney of the Landowners Corporation, an audit report for the year ending July 31, 1942, was examined and approved. The report also showed the issuance of the above-mentioned stock. Like audit reports covering subsequent years were presented, examined and approved at stockholders' meetings, held in January and December, 1944.
 
 
 70
 The minutes of the annual meeting of the stockholders of the B-M Company, held on January 20, 1942, which were read and approved at the annual stockholders' meeting in 1943, showed Black as the owner of 70,000 shares of B-M Company common stock. The same is true with respect to the minutes of the stockholders' meeting, held on January 27, 1943, which were read and approved at the stockholders' meeting in January, 1944.
 
 
 71
 At the annual meeting of the stockholders, held on December 6, 1944, the stockholders adopted a resolution authorizing the purchase from Marshall of 38,978.75 shares held by him and on the same day the board of directors adopted a like resolution and a written contract was entered into for the purchase of such shares from Marshall.
 
 
 72
 Finally, many of the audit reports referred to above were furnished to a number of persons who were members of the Aledo Group.
 
 
 73
 The trial court found that Black and Marshall were issued 20,000 shares of common stock, 2,000 shares of preferred stock, and an additional 64,870 shares of common stock in exchange for the Kansas leases and that the corporate records reflected these facts.
 
 
 74
 That the corporate records reflected such facts was established by uncontroverted written evidence. That such stock was issued to Black and Marshall in exchange for an assignment of the Kansas leases was unequivocally testified to by Black.
 
 
 75
 Since the trial judge has the opportunity of observing a witness while testifying and his demeanor on the witness stand, ordinarily the questions of the credibility of the witness and the weight to be given his testimony are peculiarly questions for determination by the trial court.[2]
 
 
 76
 Under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., an appellate court may not set aside findings of fact by a trial court, unless clearly erroneous, and due regard must be given to the opportunity of the trial court to judge the credibility of witnesses. When there is evidence to support a finding, the reviewing court may not set it aside as clearly erroneous, unless, on a consideration of the entire record, the reviewing court is left with the definite and firm conviction that a mistake has been committed.[3]
 
 
 77
 Under the existing facts and circumstances, it would have been strange, indeed, if Black and Marshall would have been willing to have transferred to the B-M Company the Esfeld lease, the large value of which already had been established by development, and the other four leases, which gave much promise, for 20,000 shares of common stock and 2,000 shares of preferred stock in the B-M Company.
 
 
 78
 I think it may not be said that this court, on a consideration of the entire evidence, is left with the definite and firm conviction that the finding of the trial court, last above adverted to, was clearly erroneous.
 
 
 79
 I will now assume, without conceding, that the 32,457.5 shares, one-half of the 64,870 shares issued to Black and Marshall, were issued to Black without consideration. If that occurred, the wrong was a wrong to the B-M Company, the corporation, and not a wrong to its stockholders, although they might suffer indirectly because thereof. It gave rise to a claim which only the corporation could assert, or the stockholders in a proper case as a derivative action. In legal effect a derivative action by a stockholder or stockholders is one conducted by a stockholder or stockholders as the corporation's representative.[4]
 
 
 80
 The stockholder is only a nominal plaintiff. The corporation is the real party in interest.[5]
 
 
 81
 Where the plaintiff does not seek to enforce relief for the benefit of the corporation, it is not derivative.[6]
 
 
 82
 Unless otherwise provided by statute, a stockholders' derivative action is always one in equity.[7]
 
 
 83
 In a derivative action the stockholder stands in the corporation's shoes and must base his action on the corporation's rights and a wrong to it.[8]
 
 
 84
 A stockholder cannot sue unless there is, at the time he brings the suit, a cause of action which could be instituted by the corporation if it so desired.[9]
 
 
 85
 The relief granted will be exactly the same as the corporation might have had if it had been plaintiff.[10]
 
 
 86
 Any recovery belongs to the corporation. Direct relief to the stockholders cannot properly be granted.[11]
 
 
 87
 Any defense, affirmative, or for want of facts, that would be good if the corporation itself was plaintiff is also good in a stockholders' derivative action.[12]
 
 
 88
 A judgment against the corporation in an action brought by it involving the same subject matter ordinarily is a defense to a derivative action.[13]
 
 
 89
 The majority holds that the Aledo Group could not maintain the derivative action and that the co-receivers could not maintain a direct action for the benefit of the corporation on account of the alleged issue to Black of the 32,457.5 shares of stock for reasons set forth in the majority opinion.
 
 
 90
 The action by the co-receivers, cause No. W-143, was commenced more than six years after the directors and certainly many of the stockholders had full knowledge of the fact that 64,870 shares of stock in the B-M Company had been issued to Black and Marshall, purportedly in exchange for transfer of the Kansas leases.
 
 
 91
 Section 60-306, G.S.Kan.Anno.1949, in part provides:
 
 
 92
 "Third. Within two years: An action for trespass upon real property; an action for taking, detaining or injuring personal property, including actions for the specific recovery of personal property; an action for injury to the rights of another, not arising on contract, and not hereinafter enumerated; an action for relief on the ground of fraud — the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud."
 
 
 93
 Even if it can be said to be an action for fraud, the suit must have been commenced within two years after the discovery of such facts as could on reasonably diligent inquiry or investigation lead to the knowledge of the fraud.[14]
 
 
 94
 It seems clear to me that the corporate action was barred by the Kansas statute of limitations. Likewise, it is clear that on June 28, 1949, when the derivative action was commenced, an action brought by the corporation would likewise have been barred by the Kansas statute of limitations.
 
 
 95
 Under facts clearly established in the evidence, it certainly is beyond the realm of possibility that the Aledo Group, as stockholders, and a portion of them as directors, did not know, at least more than four years from the time the first of the actions was commenced, all of the facts with respect to the issuance of the 64,870 shares of stock to Black and Marshall.
 
 
 96
 Applying the statute of limitations by analogy, the derivative action was clearly barred by laches.
 
 
 97
 If the 32,457.5 shares of stock were wrongfully issued to Black, a like amount of the stock was wrongfully issued to Marshall, yet the Aledo Group, in 1944, not only knew of the issuance of such stock to Marshall, but they joined as stockholders and a portion of them as directors in the adoption of resolutions which ultimately resulted in the purchase of such stock from Marshall, thus acquiescing in the original issue of stock to Black and Marshall.
 
 
 98
 The majority, conceding that neither the corporate action nor the derivative action may be maintained, hold that certain persons who compose only a portion of the stockholders at the time of the alleged wrongful issue of such stock to Black, but who are no longer stockholders in the corporation, may recover the indirect or consequential damages suffered by them on account of the wrongful issue of such stock. They thus permit recovery by a limited group of former stockholders for a wrong done to the corporation, which resulted not only in indirect injury to such former stockholders, but to other stockholders, such as the Landowners Association and their successors.
 
 
 99
 If the 32,457.5 shares of stock issued to Black were, in fact, issued without consideration in 1940, the wrong was a primary wrong to the corporation, which resulted in indirect injury to all of the stockholders of the B-M Company at that time.
 
 
 100
 Since the wrong complained of was a wrong to the corporation, resulting in immediate and direct injury to it and only indirect or consequential damage to all of the stockholders, a stockholder or stockholders could not maintain an individual action to recover damages for such wrong.[15]
 
 
 101
 A stockholder cannot maintain an action in his own name and in his own behalf to recover loss resulting from depreciation of the value of his stock caused by an injury to the corporation itself.[16]
 
 
 102
 It is only when the injury to the shares of the stockholder is peculiar to him alone and does not fall alike upon other stockholders that he can recover as an individual.[17]
 
 
 103
 The theory upon which such relief is given by the majority opinion to the Aledo Group is contrary to the theory of recovery for such alleged wrong set forth in the pleadings and to the theory upon which the case was presented, both in the trial court and in this court.
 
 
 104
 For the reasons indicated, I respectfully dissent from that portion of the opinion which directs the granting of relief to the Aledo Group, because of the issuance of the 32,457.5 shares of stock to Black.
 
 
 
 Notes:
 
 
 [1]
 Faber-Musser Co. v. William E. Dee Clay Mfg. Co., 291 Ill. 240, 126 N.E. 186; 2 C.J.S., Agency, § 96, pp. 1205-1220; See also: Anheuser-Busch v. Grovier-Starr Produce Co., 10 Cir., 128 F.2d 146; Greep v. Bruns, 160 Kan. 48, 159 P.2d 803; Siedhoff v. Campbell, 141 Kan. 255, 40 P.2d 404; Nelson Development Co. v. Ohio Oil Co., D.C., 45 F.Supp. 933; Spann v. Commercial Standard Ins. Co. of Dallas, Texas, 8 Cir., 82 F.2d 593; Metropolitan Life Ins. Co. v. Henderson, 9 Cir., 92 F.2d 891; Ferro Concrete Const. Co. v. United States, 1 Cir., 112 F.2d 488, certiorari denied 311 U.S. 697, 61 S.Ct. 136, 85 L.Ed. 452; Roth v. Hyer, 5 Cir., 133 F.2d 5, certiorari denied 318 U.S. 782, 63 S.Ct. 859, 87 L. Ed. 1149
 
 
 [2]
 Zimmer v. Acheson, 10 Cir., 191 F.2d 209, 212; Brown v. American National Bank, 10 Cir., 197 F.2d 911, 914
 
 
 [3]
 United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746; H. F. Wilcox Oil & Gas Co. v. Diffie, 10 Cir., 186 F.2d 683, 696
 
 
 [4]
 Eriksson v. Boyum, 150 Minn. 192, 184 N.W. 961, 963; Morris v. Elyton Land Co., 125 Ala. 263, 28 So. 513, 516. Fletcher Cyclopedia Corporations, Perm. Ed., Vol. 13, § 5939
 
 
 [5]
 Thomson v. Mortgage Inv. Co., 99 Cal. App. 205, 278 P. 468, 471; Smith v. Lewis, 211 Cal. 294, 295 P. 37, 39; Hayden v. Perfection Cooler Co., 227 Mass. 589, 116 N.E. 871, 872; Fletcher Cyclopedia Corporations, Perm.Ed., Vol. 13, § 5939
 
 
 [6]
 Spear v. H. V. Greene Co., 246 Mass. 259, 140 N.E. 795, 798; Moore v. Las Lugos Gold Mines, 172 Wash. 570, 21 P.2d 253, 263; Fletcher Cyclopedia Corporations, Perm.Ed., Vol. 13, §§ 5908, 5939
 
 
 [7]
 Moore v. Las Lugos Gold Mines, 172 Wash. 570, 21 P.2d 253, 263; Fletcher Cyclopedia Corporations, Perm.Ed., Vol. 13, § 5944
 
 
 [8]
 Lawrence v. Southern Pac. Co., C.C., 180 F. 822, 825; Turner v. Markham, 155 Cal. 562, 102 P. 272, 275; Caldwell v. Eubanks, 326 Mo. 185, 30 S.W.2d 976, 980, 72 A.L.R. 621; Waters v. Horace Waters & Co., 201 N.Y. 184, 94 N.E. 602, 604; Smith v. Lewis, 211 Cal. 294, 295 P. 37, 39; Fletcher Cyclopedia Corporations, Perm.Ed., Vol. 13, § 5947
 
 
 [9]
 Kessler v. Ensley Co., C.C., 123 F. 546, 550, certiorari denied 205 U.S. 541, 27 S.Ct. 788, 51 L.Ed. 921; Smith v. Lewis, 211 Cal. 294, 295 P. 37, 39; Seitz v. Michel, 148 Minn. 80, 181 N.W. 102, 105, 12 A.L.R. 1060; Cochran v. Shetler, 286 Pa. 226, 133 A. 232, 234; Outing v. Plum, 212 Iowa 1169, 235 N.W. 559, 560; Fletcher Cyclopedia Corporations, Perm.Ed., Vol. 13, § 5947
 
 
 [10]
 Collins v. Penn-Wyoming Copper Co., D.C., 203 F. 726, 729; Morris v. Elyton Land Co., 125 Ala. 263, 28 So. 513, 516; Reid v. Robinson, 64 Cal.App. 46, 220 P. 676, 680; Fletcher Cyclopedia Corporations, Perm.Ed., Vol. 13, § 6027
 
 
 [11]
 Jacobs v. First Nat. Bank of Shreveport, D.C., 35 F.2d 227, certiorari denied 284 U.S. 634, 52 S.Ct. 18, 76 L.Ed. 540; Joyce v. Congdon, 114 Wash. 239, 195 P. 29, 30; Caldwell v. Eubanks, 326 Mo. 185, 30 S.W.2d 976, 980, 72 A.L.R. 621; Harris v. Pearsall, 116 Misc. 366, 190 N.Y.S. 61, 75; Fletcher Cyclopedia Corporations, Perm.Ed., Vol. 13, § 6028
 
 
 [12]
 Kessler v. Ensley Land Co., D.C., 148 F. 1019, 1020, certiorari denied 205 U.S. 541, 27 S.Ct. 788, 51 L.Ed. 921; Fletcher Cyclopedia Corporations, Perm.Ed., Vol. 13, § 5859
 
 
 [13]
 Hawkins v. Glenn, 131 U.S. 319, 329, 9 S.Ct. 739, 33 L.Ed. 184
 
 
 [14]
 See City of Coffeyville v. Metcalf, 134 Kan. 361, 5 P.2d 807, 810; Woodworth v. Kendall, 172 Kan. 332, 239 P.2d 924, 926
 
 
 [15]
 Seitz v. Michel, 148 Minn. 80, 181 N.W. 102, 105, 12 A.L.R. 1060; Wells v. Dane, 101 Me. 67, 63 A. 324, 325, 326; Niles v. New York Cent. & H. R. R. Co., 176 N.Y. 119, 68 N.E. 142, 144; White v. British Type Investors, 130 N.J.Eq. 157, 21 A.2d 681, 683
 
 
 [16]
 Green v. Victor Talking Mach. Co., 2 Cir., 24 F.2d 378, 380, 59 A.L.R. 1091, certiorari denied 278 U.S. 602, 49 S.Ct. 9, 73 L.Ed. 530; Stinnett v. Paramount-Famous Lasky Corp., Tex.Com.App., 37 S.W.2d 145, 149; Bartlett v. New York, N. H. & H. R. R. Co., 221 Mass. 530 109 N.E. 452, 453; Caldwell v. Eubanks, 326 Mo. 185, 30 S.W.2d 976, 980, 72 A.L.R. 621; Niles v. New York Cent. & H. R. R. Co., 176 N.Y. 119, 68 N.E. 142, 144; Baillie v. Columbia Gold Mining Co., 86 Or. 1, 166 P. 965, 969, 167 P. 1167; 18 C.J.S., Corporations, § 559, p. 1272
 
 
 [17]
 Oliphant v. Woodburg Coal & Mining Co., 63 Iowa 332, 19 N.W. 212, 214, 215; Dudley v. Armenia Ins. Co., 115 App.Div. 380, 100 N.Y.S. 818, 820